# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 97-3020

_____

United States of America,     *
     *
     Appellant,     *
     *     Appeal from the United States
     v.     *     District Court for the
     *     Northern District of Iowa.
Terry O'Kane,     *
     *
     Appellee.     *
     *
     *

_____

Submitted: February 12, 1998
Filed: September 9, 1998

_____

Before WOLLMAN and HANSEN, Circuit Judges, and DAVIS[1], District Judge.

_____

HANSEN, Circuit Judge.

The United States appeals the sentence imposed upon Terry O'Kane for his pleas of guilty to one count of a 24-count indictment and to a one-count information drawn against him. For the reasons given below, we reverse and remand for resentencing.

---

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota, sitting by designation.

## I.

Terry O'Kane collected baseball cards. What began as an innocuous hobby had by 1992 become something more. O'Kane expanded his collection by an elaborate fraud. He worked as an assistant manager of a grocery store, where he could order large volumes of cards on the store account. When they arrived, he intercepted the shipments and took them home or to a storage shed he had rented for keeping the cards. He retained some portion of the shipments but sold the remainder. Using his employer's shipping account, he sent cards to dealers in Minnesota and Texas, who purchased them at a 25 percent discount. O'Kane intercepted the checks from those dealers and deposited them in one of various bank accounts under his control. In all, he managed to defraud his employer of over $300,000 worth of baseball cards before investigators discovered his scheme. In the meantime, he had used a portion of his ill-gotten gains to purchase various items of personal property, including a personal computer and a pickup truck.

When his scheme came to light in January 1996, O'Kane immediately confessed his crime to store investigators and again to police. A federal grand jury returned a 24-count indictment against him on May 22, 1996, charging 18 counts of mail fraud, in violation of 18 U.S.C. § 1341; one count of interstate shipment of stolen goods, in violation of 18 U.S.C. § 2314; three counts of money laundering by engaging in monetary transactions involving criminally derived property of a value in excess of $10,000, in violation of 18 U.S.C. § 1957; one count of money laundering with the intent to carry on a specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and with the forfeiture of personal property pursuant to 18 U.S.C. § 982. On February 28, 1997, O'Kane entered into a plea agreement with the government, in which he agreed to plead guilty to one count of mail fraud and to a one-count information charging money laundering in the purchase of a pickup truck, of a value greater than $10,000, in violation of 18 U.S.C. § 1957, which information the government then filed on April 10, 1997. As part of the plea agreement, he agreed to

2

forfeit all the sports cards still in his possession, money gained from selling the cards, and other personal property (some of which he had acquired with proceeds from the fraud), as well as a large portion of an employee retirement account he had through the grocery. As a result, by the time he entered his plea of guilty, he had made complete restitution to his former employer for his crime.

At sentencing, the district court first determined the base offense levels for O'Kane's two offenses of conviction according to the United States Sentencing Guidelines. Mail fraud, 18 U.S.C. § 1341, has a base offense level of 6, which increases according to the value of the fraud. O'Kane's total fraud, $304,667, added 8 levels, and the court added two more for more than minimal planning, resulting in a level 16 for the mail fraud count. See U.S. Sentencing Guidelines Manual § 2F1.1 (1995). Money laundering under 18 U.S.C. § 1957, has a base offense level of 17, to be increased by two for knowledge that the funds were derived from a specified unlawful activity. See USSG § 2S1.2(b)(1)(B). The Guidelines provide for no dollar adjustment if the laundering is for an amount less than $100,000. Since the government had charged O'Kane with laundering $73,562.50, his money laundering offense level remained 19. See USSG § 2S1.2. The court grouped the fraud and money laundering counts together to arrive at a single group with a base offense level of 19, see USSG § 3D1.2(b), then reduced the base offense level three levels to 16 for O'Kane's acceptance of responsibility. See USSG § 3E1.1. The court then departed downward an additional four levels for unusual acceptance of responsibility, resulting in a final offense level of 12 and a sentencing range of 10 to 16 months. O'Kane had no prior criminal history. The court sentenced O'Kane on each of the two counts to five months' imprisonment with a work release recommendation, followed by five months' home confinement. The sentences were to be served concurrently. The government raised timely objections to both the grouping and departure decisions, and now appeals both.

3

## II.

"We review findings of fact at the sentencing hearing for clear error and give due deference to the district court's application of the guidelines to the facts." United States v. Brelsford, 982 F.2d 269, 271 (8th Cir. 1992). But "we review . . . the district court's application and construction of the guidelines de novo," United States v. Wells, 127 F.3d 739, 744 (8th Cir. 1997), and "[w]e review a district court's decision to depart from the Guidelines for an abuse of discretion." United States v. McNeil, 90 F.3d 298, 300 (8th Cir. 1996), cert. denied, 117 S. Ct. 596 (1996).

The government argues first that the district court erred at sentencing by grouping the mail fraud count with the money laundering count under Section 3D1.2(b) of the Guidelines. According to the government, the proper application of Part 3D to O'Kane's counts of conviction yields a base offense level of 21 rather than 19, as the district court found. A brief recapitulation of the grouping procedure clarifies the calculation.

After determining the base offense level appropriate for each individual count pursuant to Chapter 2 of the Guidelines, the sentencing court then determines whether to adjust the base levels to reflect the presence of multiple counts. This exercise "seek[s] to provide incremental punishment for significant additional criminal conduct." USSG Ch. 3, Pt. D, intro. comment. First, the court must group closely related counts according to Section 3D1.2; then determine the offense level for each group according to Section 3D1.3; and then find a combined offense level according to Section 3D1.4. A "group" in Part 3D may consist of only one count, if no counts relate so closely to one another as to justify grouping them together under Section 3D1.2. Or, all counts of conviction may fall into a single "group," eliminating the need to "combine" groups under Section 3D1.4. See USSG § 3D1.2, comment. (n.7).

4

Guided by these rules, the district court grouped O'Kane's two counts together as "involving the same victim and . . . connected by a common criminal objective."  See USSG § 3D1.2(b).  Then, since the court had grouped the two counts under Section 3D1.2(b), Section 3D1.3(a) determined the offense level, setting it at the level of the most serious count in the group.  As indicated above, O'Kane's fraud count carried an offense level of 16; his money laundering count an offense level of 19.  After grouping the two counts together there was only one group, so the court had no need to "combine" groups pursuant to Section 3D1.4, and thus concluded that, before assessing any adjustment under Section 3E1.1 for acceptance of responsibility, or any departure under Section 5K2.0, O'Kane had an offense level of 19 for the single two-count group.

To group the two counts under Section 3D1.2(b) properly, the court must determine that the same person or entity was the victim of both crimes.  Clearly, O'Kane's employer was the victim of his fraud, but it is not as immediately clear who suffered as a result of his money laundering.  Several courts have found money laundering to have as its specific victim the same victim as the underlying fraud.  See, e.g., United States v. Leonard, 61 F.3d 1181, 1186 (5th Cir. 1995) (holding fraud and money laundering constituted "a single, integrated scheme to obtain money from the elderly victims and to use that money to facilitate the continuance of the scam."); United States v. Mullens, 65 F.3d 1560, 1564 (11th Cir. 1995) ("the fraud and the money laundering were integral cogs in continuing the scheme."); United States v. Cusumano, 943 F.2d 305, 313 (3d Cir. 1991) (grouping proper under (b) because money laundering and fraud "were all part of one overall scheme" against a single victim.).

However, the government has support for its assertion that societal interests, rather than specific victims, are harmed by money laundering; and, therefore, that O'Kane's crimes should not be grouped under Section 3D1.2(b).  In a First Circuit case in which a defendant was sentenced under the same guidelines as O'Kane, the court held that "for the purposes of these subsections, the victim of fraud is the insurance

5

company and the victim of money laundering is society." United States v. Lombardi, 5 F.3d 568, 570 (1st Cir. 1993). See also United States v. Harper, 972 F.2d 321, 322 (11th Cir. 1992) (per curiam) (remarking that money laundering invades societal interests); United States v. Lopez, 104 F.3d 1149, 1150 (9th Cir. 1997) (per curiam) (holding that money laundering harms society generally).

The Guidelines also indicate those concerns which should drive our inquiry. The Sentencing Commission intended the grouping rules to "limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct." USSG Ch. 3, Pt. D, intro. comment. Defrauding one's employer is not offense conduct substantially identical to laundering part of the proceeds of that fraud, and the court moved far beyond "limit[ing] the significance of the . . . charg[e]" by grouping the counts in a manner which punishes O'Kane solely for his money laundering, with no additional punishment for his fraud. The district court's grouping defeats the express purpose of Part 3D, "to provide incremental punishment for significant additional criminal conduct." Id.

The Guidelines instruct the sentencing court first to calculate all individual sentences according to Chapter 2, then, "*[w]hen offenses are closely interrelated*, group them together for purposes of the multiple-count rules." Id. (emphasis added). O'Kane's fraud and money laundering are not closely interrelated. Again, we do not simply squint at shadows on a dark wall; the Guidelines provide clear examples of the types of counts which should be grouped under Section 3D1.2(b). A count of conspiracy to commit extortion and the substantive extortion count should be grouped; multiple counts of mail and wire fraud directed at the same victim should be grouped; and multiple counts of delivery of a controlled substance can be grouped, all under Section 3D1.2(b). USSG § 3D1.2 comment. (n.4). These examples make clear that, had O'Kane pled guilty to multiple counts of fraud, those counts would properly have been grouped. But O'Kane's separate offenses of fraud and money laundering are not so closely interrelated as to justify grouping under (b). The offenses entail different

6

kinds of proscribed conduct, punishable on different scales, which harm distinct and different victims.

The Guidelines expressly state that so-called "victimless crimes" harm societal interests. "For offenses in which there are no identifiable victims . . . the 'victim' for purposes of subsections (a) and (b) is the societal interest that is harmed." USSG § 3D1.2, comment. (n.2). Fraud clearly harms the defrauded. But money laundering harms society's interest in discovering and deterring criminal conduct, because by laundering the proceeds of crime, the criminal vests that money with the appearance of legitimacy. The interest of the law-abiding general public in preventing the criminals among us from profiting from their crimes is invaded when criminally derived funds are laundered to allow the criminal unfettered, unashamed and camouflaged access to the fruits of those ill-gotten gains. Therefore, we choose to follow those circuits which have held that money laundering invades a distinct societal interest. Since O'Kane harmed two different victims--his employer by fraud and society by laundering his ill-gotten proceeds--the district court erred by grouping his counts of conviction under Section 3D1.2(b).

In support of grouping under Section 3D1.2(b), O'Kane points to undisputed facts in the Presentence Investigation Report (PSIR) showing that his act of money laundering involved the purchase of a pickup truck which he used to help facilitate his fraud. Therefore, he concludes, his money laundering had the same victim as his fraud, and the two counts should be grouped under Section 3D1.2(b). This conclusion hangs on a thread too slender to bear its weight. O'Kane had begun both his fraud and his money laundering activities over a year before he purchased the pickup truck, and although the PSIR indicates that, after its purchase, he used the truck to remove some cards from his employer's premises, O'Kane does not claim that the truck purchase was for the sole or even primary purpose of continuing his fraud. The undisputed fact that it was incidentally used on occasions "to haul stolen property from" his employer's

7

premises, see PSIR Adden. n.2, does not change the legal conclusion that he harmed a different victim by his money laundering than by his fraud.

Further, O'Kane did not plead guilty to money laundering under 18 U.S.C. § 1956, although he was originally charged with one count under that more serious "reinvestment" money laundering statute. Section 1956(a)(1)(A)(i) proscribes money laundering done "with the intent to promote the carrying on of specified unlawful activity" and carries a base offense level of 23. The terms of O'Kane's plea agreement permitted him to plead guilty only to a violation of 18 U.S.C. § 1957, which does not require that the laundering conduct promote the underlying crime, and it likewise has a significantly lower base offense level, 17. O'Kane cannot have his cake and eat it, too. His plea agreement with the government reduced his offense level by six from what it would have been had he gone to trial and been convicted. Part of that reduction comes from him not pleading guilty to reinvesting his laundered funds into his ongoing criminal enterprise. Having pled guilty to the less serious form of money laundering under Section 1957, he should not be allowed to further reduce his offense level by arguing that he harmed the same victim by both crimes because his illegal laundering truly was of the more serious Section 1956(a)(1)(A)(i) "reinvestment" kind.

Simply because the district court did not properly group the counts under Section 3D1.2(b) does not end our grouping inquiry. "Counts are to be grouped together into a single Group if any one or more of the subsections provides for such a grouping." USSG § 3D1.2, comment. (n.1). The government argues that if grouping is proper at all, it is proper under Section 3D1.2(d), which requires grouping counts for which "the offense level is determined largely on the basis of the total amount of harm," USSG § 3D1.2(d), and, if covered by different guidelines, where those offenses "are of the same general type and otherwise meet the criteria for grouping under this subsection." Id. § 3D1.2, comment. (n.6).

8

The government's argument is foreclosed by the recent decision of this court "that fraud and money laundering are not so closely related as to allow loss and value grouping under § 3D1.2(d)." United States v. Hildebrand, 1998 WL 420504, at *4. The final offense level determination is made differently when counts are grouped under Section 3D1.2(d) than when they are grouped under (a) through (c). When multiple counts covered by different Guidelines are grouped under (d), the aggregate quantity of harm from all counts is used to increase the base offense level of the most serious count in the group determined by the applicable Guidelines rules from Chapter 2. So, while O'Kane was charged with defrauding his employer of $304,667 but laundering only $73,562.50 of the fraudulently obtained monies, if the counts were grouped under Section 3D1.2(d), he would be punished for laundering the total sum of $378,229.50, thereby increasing his offense level to 22.[2] See USSG § 3D1.3(b). "[B]ecause the base offense levels for money laundering are much higher than the base offense level for fraud, . . . it is wrong to assume that the Sentencing Commission intended to equate the amount of fraud loss with the value of money laundered for every fraudulent scheme that includes some form of money laundering." Hildebrand, 1998 WL 420504, at *4.[3]

While it is clear that several separate money laundering counts could properly be grouped together under (d), as could several fraud counts, it is not clear that counts of those separate offenses necessarily "otherwise meet the criteria for grouping under

_____

[2]The government's brief does not correctly account for the increase due to aggregate quantity. It contends that the offense level under Section 3D1.2(d) would be 21, due to a two level increase for a quantity between $200,000 and $350,000. But O'Kane's unobjected-to relevant offense conduct contained in the PSIR includes $304,667 of fraud and $73,562.50 of money laundering under 18 U.S.C. §§ 1956 and 1957. The total, $378,229.50, requires a three level increase. See USSG § 2S1.2(b)(2).

[3]We note, as did the Hildebrand panel, that in a case where all the fraud proceeds were also laundered, these concerns might not arise. See id. at *4 n. 2.

this subsection [d]."  USSG § 3D1.2, comment. (n.6).  One of the criteria is that the offense level be "largely determined" by "the amount of harm or loss."  Section 3D1.2(d).  Here, there is no question that the fraud offense level was largely determined (and increased) by the aggregate amount involved.  The money laundering count, on the other hand, did not increase because of amount, but rather did increase by two levels for O'Kane's knowledge that the funds came from a specified unlawful activity, and ended up at 19.  Laundering any amounts less than $100,000 (as O'Kane did here) has no effect at all on the offense level for money laundering.  On the facts before us, the offense level for money laundering is not "determined largely on the basis of the total amount of harm or loss;" rather it is determined largely by the eleven level higher starting <u>base</u> offense level.  Therefore, grouping under Section 3D1.2(d), as argued for by the government, is not appropriate.  <u>See, e.g.,</u> <u>United States v. Kneeland</u>, 148 F.3d 6, 15-16 (1st Cir. 1998).

Since none of the grouping rules properly apply to O'Kane's two counts of conviction, those counts must remain in separate, one-count "groups" for the purpose of "combining" under Section 3D1.4.  After separately computing the offense levels for each group, the Guidelines instruct the court to "[c]ount as one Unit the Group with the highest offense level.  Count one additional Unit for each Group that is equally serious or from **1** to **4** levels less serious."  USSG § 3D1.4(a).  O'Kane's money laundering offense (level 19) counts as one Unit; his fraud offense (level 16) counts as an additional Unit because it is not more than 4 levels less serious.  For two Units, Section 3D1.4 instructs the sentencing court to add two levels to the higher offense group, which in O'Kane's case yields an offense level 21 before any reduction for acceptance of responsibility.

### III

The government also challenges the district court's departure which was based on unusual acceptance of responsibility.  After grouping the two counts and arriving at

a base offense level of 19, the court decreased O'Kane's offense level by two levels pursuant to USSG § 3E1.1(a), finding that he had "clearly demonstrate[d] acceptance of responsibility for his offense." The court further reduced O'Kane's offense level by one additional level pursuant to USSG § 3E1.1(b), finding that he had "timely provided complete information to the government concerning his own involvement in the offense; or timely notified authorities of his intention to enter a plea of guilty." Id. The court continued, however, finding "that a downward departure of 4 additional levels [was] warranted based on [O'Kane's] extraordinary acceptance of responsibility. With the 4-level reduction, [O'Kane's] total offense level [was] 12. And with [his] criminal history category of I, the guideline range [was] 10 to 16 months." (Sent. Tr. at 82-83.) The court then sentenced O'Kane to five months' imprisonment with a work-release recommendation, followed by five months' home confinement, concurrent on each of the two counts.

"The appellate court should not review the departure decision de novo, but instead should ask whether the sentencing court abused its discretion." Koon v. United States, 518 U.S. 81, 91 (1996). But even reviewing under this deferential standard, we conclude that the district court erred in departing from the Guidelines based on O'Kane's supposed exceptional acceptance of responsibility. To justify departure, a "case must be found unusual enough for it to fall outside the heartland of cases in the Guideline." Id. at 98. This case clearly does not. The district court departed four levels based on O'Kane's acceptance of responsibility as demonstrated by his restitution to his employer of the full value of his fraud prior to adjudication; his immediate admission of his conduct to authorities; and his continued cooperation during the investigation. (Appellant's Adden. at 7.) Our authorities, as well as the Guidelines themselves, make clear that this is an insufficient basis for departure.

Departure from the Sentencing Guidelines is warranted only when "the court finds that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines

and that should result in a sentence different from that described." 18 U.S.C. § 3553(b). Victim restitution is a listed basis for reducing the offense level within the Guideline for acceptance of responsibility. "In determining whether a defendant qualifies under [section 3E.1.(a)], appropriate considerations include . . . voluntary payment of restitution prior to adjudication of guilt." USSG § 3E1.1, comment. (n.1(c)). That is, in deciding whether a defendant qualifies for the initial adjustment in offense level for acceptance of responsibility, the court should consider whether the defendant has voluntarily made restitution to the victims of his crimes. Since the Commission has explicitly listed restitution as a ground for adjustment within the acceptance of responsibility Guideline, it is not possible to view it as a "circumstance . . . not adequately considered" which would move O'Kane out of the heartland of cases and justify a departure under Section 5K2.0 unless something considerably more unusual is at play.

This court has recognized that voluntary restitution can be made under circumstances which warrant the district court's consideration of a departure. In United States v. Garlich, 951 F.2d 161 (8th Cir. 1991), the defendant had repaid the victims of his fraud over $1.4 million even before he was indicted. Upon entering a plea of guilty, the sentencing court determined that the total harm caused by Garlich's crime was only $253,000. In remanding for resentencing we said, "Although the district court gave Garlich this reduction [for acceptance of responsibility], we conclude the district court should consider whether the extent and timing of Garlich's restitution are sufficiently unusual to warrant a downward departure." Id. at 163. In this circuit, after Garlich, a six-fold repayment of harm, made over the objection of one's own counsel, a full year before indictment, may be sufficiently outside the heartland of cases to warrant the district court's consideration of departure.

O'Kane's restitution does not approach the circumstances of Garlich. We note that O'Kane was actively involved in negotiations with state and federal authorities for over a year after his crime was first discovered before he entered into a plea agreement,

one consequence of which was that the government dropped 23 of 25 charges against him. Further, although by the terms of the plea agreement O'Kane stipulated to the amount of his fraud, and thus the amount of restitution required of him, he disputed the accuracy of that amount at sentencing and again in his briefs to this court. Nor has he overpaid any restitution, a la Garlich. To his credit, he has made full restitution, but a large part of that consisted of returning the goods he had stolen but not yet peddled elsewhere. Finally, although he admitted much of his conduct to investigators, he did not voluntarily disclose the largest purchaser of his stolen merchandise. O'Kane's conduct simply does not remove O'Kane's case from the heartland of acceptance of responsibility cases so as to permit departure. The district court abused its discretion when it departed.

We are also troubled by the fact that the court did not explain why the circumstances it found so exceptional warranted a departure which more than doubled the reduction O'Kane had already received for acceptance of responsibility under Section 3E1.1. The court did not explain why it took a departure of four levels (amounting to a two-thirds reduction in possible punishment) as opposed to, say, only a one level departure, in order to adequately compensate O'Kane for the extraordinary acceptance of responsibility the court thought was present. The absence of such an explanation would have made it difficult for us to assess the reasonableness of the extent of the court's departure if it were necessary for us to proceed to determine that issue.

IV.

Accordingly, we reverse the judgment of the district court, vacate O'Kane's sentence, and remand for resentencing in accordance with this opinion.

13

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.