# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-2847

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| | * |
| Donald B. Pennington, | * |
| | * |
| Defendant - Appellant. | * |

_____

No. 97-2888
No. 97-3152

_____

Appeals from the United States
District Court for the
Eastern District of Arkansas.

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee/Cross-Appellant, | * |
| | * |
| | * |
| v. | * |
| | * |
| | * |
| John E. Oldner, | * |
| | * |
| Defendant - Appellant/Cross-Appellee. | * |
| | * |

_____

Submitted:  September 22, 1998

Filed: February 5, 1999

_____

Before BEAM, LAY, and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

In the early 1990s, Donald Pennington was President of Harvest Foods, a grocery store chain. He received secret payments or kickbacks from consultant John Oldner and food broker Billy Armstrong based on monies they received from Harvest Foods and its suppliers. Pennington and Oldner were indicted on multiple counts of mail fraud and money laundering. (Armstrong was indicted but not tried because of illness.) A jury convicted Pennington and Oldner of aiding and abetting mail fraud in violation of 18 U.S.C. §§ 1341 and 2, and of twelve counts of aiding and abetting money laundering in violation of 18 U.S.C. §§ 1957 and 2. It convicted Oldner of witness tampering in violation of 18 U.S.C. § 1512(b)(1). The district court[1] sentenced Pennington to forty-eight months in prison. After granting a downward departure, the court sentenced Oldner to twenty-eight months in prison. Both defendants appeal their convictions. Pennington appeals his sentence. The government cross appeals Oldner's sentence. We affirm both judgments.

## I. Challenges to the Government's Case.

Viewing the evidence in the light most favorable to the jury's verdict, the trial record reveals four distinct aspects of the scheme to defraud Harvest Foods.

1. In February 1990, Harvest Foods began paying $10,000 per month to Oldner's consulting company, John E. Oldner and Associates. The monthly payments

---

[1]The HONORABLE STEPHEN M. REASONER, Chief Judge of the United States District Court for the Eastern District of Arkansas.

increased to $15,000 per month in July 1990. Shortly after Oldner received each monthly payment, he sent a check to Capitol City Marketing, a consulting company owned by Pennington, for exactly one-half of the amount paid by Harvest Foods.

2. In the spring of 1990, another Harvest Foods employee, Scott McPherson, decided to award a supply contract to SAJ, Inc. Pennington intervened, telling McPherson to get Oldner involved because any commission or bonus Oldner received from SAJ could be split among the three of them. Oldner then entered into a consulting agreement with SAJ under which he received a $90,000 bonus for negotiating the contract with Harvest Foods plus a commission on all SAJ sales to Harvest Foods. SAJ increased its prices to Harvest Foods by one percent to cover the bonus paid to Oldner. When Oldner received payments from SAJ, he wrote checks for one third of the amounts to Capitol City Marketing (Pennington's company) and to Horizon Marketing (a consulting company McPherson formed for this purpose at Pennington's suggestion). After McPherson moved to Arizona, he continued to receive checks from Oldner until he told Pennington he no longer wished to be involved.[2] SAJ's president testified that Harvest Foods paid too much for its purchases under this arrangement.

3. The owner of a Harvest Foods supplier, Big R Ice, testified that his company normally did not use food brokers or consultants. However, based on its understanding that suppliers had to go through Oldner to get Harvest Foods business, Big R Ice signed two consulting contracts with Oldner, one paying John E. Oldner and Associates $50,000, and the other paying Oldner personally $25,000. The only service Oldner provided was to negotiate a supply agreement with Harvest Foods. After receiving payments from Big R Ice, Oldner sent checks to Capitol City Marketing totaling $25,000, one-half the amount Big R Ice paid to John E. Oldner and Associates.

---

[2]McPherson pleaded guilty to mail fraud charges stemming from his involvement in the scheme.

4.  Billy Armstrong negotiated a supply contract with Harvest Foods on behalf of his client, Coleman Dairy.  After ninety days, Coleman Dairy began paying Armstrong a four percent monthly commission on all sales to Harvest Foods.  Armstrong sent a check to Capitol City Marketing for one-half of each monthly payment, showing the payments on his books as "advertising and flowers."

Pennington deposited all the kickbacks he received from Oldner and Armstrong into a Capitol City Marketing bank account.  Capitol City had no other income.  The money laundering counts of conviction concerned subsequent transfers out of the Capitol City account into Pennington's personal bank account.

## A. The Mail Fraud Counts.

To sustain a conviction for aiding and abetting mail fraud, the government must prove defendants knowingly aided and abetted a scheme to defraud in which use of the mails was reasonably foreseeable.  See United States v. Hildebrand, 152 F.3d 756, 761 (8th Cir.), cert. denied sub nom, Webb v. United States, 119 S. Ct. 575 (1998).  Congress recently amended the mail fraud statutes to provide that the term "scheme or artifice to defraud" in 18 U.S.C. § 1341 includes a scheme "to deprive another of the intangible right of honest services."  18 U.S.C. §1346.  Though most "intangible rights" mail fraud cases have involved corrupt public officials, we have held that the plain language of § 1346 applies as well to schemes to violate a private sector fiduciary's duty to provide honest services to his clients.  See United States v. Jain, 93 F.3d 436, 441 (8th Cir. 1996), cert. denied, 117 S. Ct. 2452 (1997).  In this case, the government's mail fraud theory was that defendants' kickback schemes deprived Harvest Foods of its intangible right to the honest services of CEO Pennington.

1.  Pennington first argues the mail fraud indictment was legally insufficient because it charged defendants with a scheme to defraud Harvest Foods of its right to the "faithful and impartial services" of Pennington, whereas the statute prohibits

depriving another of the right to "honest" services.  Pennington first raised this issue in the middle of trial.  When an indictment is challenged after jeopardy attaches, it is upheld "unless it is so defective that by no reasonable construction can it be said to charge the offense for which the defendants were convicted."  United States v. Just, 74 F.3d 902, 904 (8th Cir. 1996) (quotation omitted).

Pennington contends  "faithful and impartial" are not the same as "honest" services, and therefore the indictment failed to charge a crime.  An indictment need not use the specific words of the statute, so long as "by fair implication" it alleges an offense recognized by law.  United States v. Mallen, 843 F.2d 1096, 1102 (8th Cir.), cert. denied, 488 U.S. 849 (1988).  Here, the mail fraud counts alleged schemes to defraud and cited 18 U.S.C. § 1341, the operative offense-declaring statute.  The indictment's failure to cite § 1346, a definitional provision, and to use its specific term, "honest" services, does not mean no crime was charged.  Moreover, Pennington does not argue, and in our view could not argue, that the indictment did not sufficiently apprise him of the charges and allow him to prepare effectively for trial.  See United States v. Diaz-Diaz, 135 F.3d 572, 576 (8th Cir. 1998).  Thus, this contention is without merit.[3]

2.  Both Pennington and Oldner argue the evidence was insufficient to convict them of mail fraud because there was no evidence they intended to defraud Harvest Foods of Pennington's honest services, and because Harvest Foods in fact benefitted from the contracts negotiated by consultant Oldner.  We will overturn a jury verdict only if no reasonable jury could have found the offense elements proved beyond a reasonable doubt.  See Hildebrand, 152 F.3d at 761.

---

[3]Pennington argues the district court erred in instructing the jury that "scheme to defraud" includes "cheat[ing] another out of" or "obtaining" the intangible right to "faithful, impartial and honest services."  Pennington did not object to this part of the instructions at trial.  Though it could have been better worded, there was no plain error.

There was overwhelming evidence that Pennington received secret kickbacks from Oldner and Armstrong from contractual payments they received as a result of doing business with Harvest Foods and its suppliers. As a Harvest Foods corporate officer, Pennington owed Harvest Foods a fiduciary duty of loyalty, including the duty to disclose all material information. Yet he never disclosed these payments to anyone at Harvest Foods; indeed, he concealed the payments by use of a sham corporation, Capitol City Marketing. Pennington and Oldner correctly assert that, when dealing with business transactions in the private sector, a mere breach of fiduciary or employee duty may not be sufficient to deprive a client or corporation of "honest services" for purposes of § 1346 -- to be guilty of mail fraud, defendants must also cause or intend to cause actual harm or injury, and in most business contexts, that means financial or economic harm. See Jain, 93 F.3d at 441-42. However, proof of intent to harm may be inferred from the willful non-disclosure by a fiduciary, such as a corporate officer, of material information he has a duty to disclose. See id. at 442; United States v. Bronston, 658 F.2d 920, 926-27 (2d Cir. 1981), cert. denied, 456 U.S. 915 (1982); United States v. Von Barta, 635 F.2d 999, 1006 (2d Cir. 1980), cert. denied, 450 U.S. 998 (1981). The jury may infer intent from circumstantial evidence. See United States v. Blumeyer, 114 F.3d 758, 767 (8th Cir.), cert. denied, 118 S. Ct. 350 (1997). Here, a reasonable jury could find that the scheme was intended to and did defraud Harvest Foods by depriving it of Pennington's honest services in obtaining the most advantageous supply, brokerage, and consulting contracts that could be negotiated.

Oldner argues he should be acquitted of aiding and abetting a scheme to defraud because there was no proof he knew of Pennington's duty to Harvest Foods. We disagree. The jury could reasonably find that Oldner, an experienced businessman, knew the secret kickbacks to Capitol City Marketing violated Pennington's duty to disclose material information to his employer.

### B.  The Money Laundering Counts.

Pennington and Oldner argue the evidence was insufficient to convict them of money laundering in violation of 18 U.S.C. §1957, which requires proof they knowingly engaged in a financial transaction involving the proceeds of a criminal offense. They argue there was no proof Oldner's payments to Pennington came from the funds received from Harvest Foods, SAJ, and Big R Ice and were therefore the proceeds of criminal fraud. This contention is without merit. The government need not trace funds to prove a violation of § 1957. See United States v. Moore, 27 F.3d 969, 976-77 (4th Cir.), cert. denied, 513 U.S. 979 (1994). Here, the timing and amounts of Oldner's payments to Pennington permitted a reasonable jury to find that these payments were a portion of Oldner's proceeds from the scheme to defraud.

Oldner argues he cannot be convicted of aiding and abetting money laundering because his involvement in the scheme ended with the mailing of checks to Pennington. The district court correctly instructed that Oldner may be convicted of aiding and abetting if he knew money laundering was being committed and "knowingly acted in some way for the purpose of causing, encouraging, or aiding" the money laundering. See, e.g., United States v. Farm & Home Sav. Ass'n, 932 F.2d 1256, 1261 (8th Cir. 1991). Oldner paid Pennington through a sham corporation, Capitol City Marketing. Oldner pretended the payments were for consulting work by Pennington and provided Pennington with a tax Form 1099 to evidence this pretense. Starting in May 1991, Oldner stopped sending checks directly to Capitol City Marketing; instead, he wrote checks to his accountant and instructed him to purchase cashier's checks payable to Capitol City. A reasonable jury could find from this evidence that Oldner knew Pennington violated § 1957 by routing fraud proceeds through the Capitol City Marketing account, and that Oldner knowingly encouraged and aided those violations.

## C.  Oldner's Obstruction of Justice.

In 1992, the government began investigating Oldner, Pennington and McPherson. McPherson agreed to cooperate. In a taped conversation between Oldner and McPherson, Oldner suggested McPherson tell the investigators that Oldner had agreed to pay McPherson around $150,000 over two years for consulting work, but the agreement was not completed because McPherson moved to Arizona. McPherson testified at trial that he never performed any consulting work for Oldner. The jury convicted Oldner of tampering with a witness in violation of 18 U.S.C. §1512(b)(1), which prohibits attempts to "knowingly . . . corruptly persuade[] another person . . . to (1) influence, delay, or prevent the testimony of any person in an official proceeding."

Oldner argues that § 1512 only prohibits witness tampering by specific means, such as physical force and intimidation. But he relies on a case decided before the statute was amended to include tampering by corrupt persuasion. After carefully examining this amendment and its legislative history, the Third Circuit concluded the ambiguous term "corruptly persuades" includes "attempting to *persuade* someone to provide *false* information to federal investigators." United States v. Farrell, 126 F.3d 484, 488 (3d Cir. 1997) (emphasis in original). We agree. Here, the evidence was sufficient for the jury to find that Oldner violated § 1512(b)(1) by telling McPherson to lie about why Oldner had paid McPherson a portion of the fraud proceeds.[4]

---

[4]We reject Oldner's contention the district court erred in excluding testimony that Oldner heard his former attorney give advice similar to some of the things Oldner told McPherson during the taped conversation. The district court did not abuse its discretion in excluding this testimony as speculative. In any event, any error would be harmless because the testimony did not undermine McPherson's testimony that Oldner told him to lie about their financial relations.

## II. Alleged Trial Errors.

Pennington argues his Sixth Amendment right to counsel was violated because his trial counsel had a conflict of interest -- he was a member of the law firm that represented Pennington in a civil case, and the law firm was facing a potential $6,000,000 malpractice suit by Pennington for causing his appeal from an adverse judgment to be dismissed as untimely. Because Pennington failed to raise this issue at trial, he must show "that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348 (1980); United States v. Acty, 77 F.3d 1054, 1056-58 (8th Cir.), cert. denied, 117 S. Ct. 189 (1996). Pennington has made neither showing. The allegedly *possible* lawsuit against counsel's law firm did not create an *actual* conflict of interest between Pennington and his counsel in the criminal case. See United States v. Moore, 159 F.3d 1154, 1158 (9th Cir. 1998). In addition, counsel defended Pennington vigorously at trial, and he has not identified any instance of adverse performance.

Pennington and Oldner argue the district court abused its discretion by not declaring a mistrial when a juror reported that Pennington's wife put a quarter in the juror's parking meter and smiled at her before the second day of the jury's deliberations. Like the district court, we reject Pennington's contention because he was present when his wife plugged the meter and therefore cannot benefit from any misconduct. Oldner argues outside juror contact of this kind is presumptively prejudicial under Remmer v. United States, 347 U.S. 227 (1954), and the jury may have held Mrs. Pennington's actions against him as well as Pennington. The government argues the presumption of prejudice does not apply in this case. Compare United States v. Wallingford, 82 F.3d 278, 281 (8th Cir.) (off-hand remark to juror by a restaurant employee not presumptively prejudicial), cert. denied, 516 U.S. 1172 (1996). Whether or not the presumption applies, we agree with the district court that the contact between Mrs. Pennington and the juror did not prejudice Oldner. The contact was short, it was explained by Pennington as a kind gesture his wife routinely

does for others, and it did not involve a favor of sufficient magnitude to likely influence a juror. Moreover, the contact occurred on the second day of deliberations, and the jury's dated verdict forms show they had returned guilty verdicts against Oldner on all the mail fraud counts, one money laundering count, and the obstruction of justice count the previous day. The district court did not abuse its discretion in refusing to declare a mistrial. See United States v. Rhodenizer, 106 F.3d 222, 225 (8th Cir. 1997) (standard of review).

Pennington argues the district court erred by not excusing a Harvest Foods employee from the jury when the new CEO of Harvest Foods, Harry Janson, testified as a government rebuttal witness. Pennington waived this issue by not challenging the juror when the jury was empaneled because the basis for the objection was then known. See Robinson v. Monsanto Co., 758 F.2d 331, 334-35 (8th Cir. 1985). Pennington knew the juror worked for Harvest Foods, knew Janson as CEO of Harvest Foods was a possible witness, and specifically asked the juror during voir dire if she knew Janson.

Pennington further argues the district court abused its discretion by allowing McPherson to testify he had pleaded guilty to mail fraud as a result of participating in the SAJ scheme. This argument is without merit. A confederate's guilty plea is admissible during the government's direct examination as evidence of the witness's credibility and of his acknowledgment he participated in the offense. See United States v. Hutchings, 751 F.2d 230, 237 (8th Cir. 1984), cert. denied, 474 U.S. 829 (1985). Here, the court gave an appropriate limiting instruction explaining that McPherson's plea could not be used as evidence against the defendants.

### III. Sentencing Issues.

A. Pennington. In determining Pennington's Guidelines sentencing range, the district court properly began with the higher base offense level for money laundering.

See U.S.S.G. §§ 2S1.2, 3D1.3(a); Hildebrand, 152 F.3d at 762.  The money laundering guideline adjusts the base offense level according to the value of the proceeds laundered.  See U.S.S.G. § 2S1.2(b)(2).  Pennington argues the court erred in aggregating the proceeds from his twelve money laundering counts of conviction in determining the value of proceeds laundered.  This contention is without merit.  The money laundering counts were properly grouped.  See U.S.S.G. § 3D1.2(d); United States v. O'Kane, 155 F.3d 969, 974 (8th Cir. 1998).  The Guidelines expressly provide that "the offense level applicable to a Group is the offense level corresponding to the aggregated quantity."  U.S.S.G. § 3D1.3(b).[5]

Pennington next argues the district court erred in denying him a downward departure because Harvest Foods received a $6,000,000 judgment in its civil fraud action against him for the conduct at issue in the criminal case.[6]  The district court concluded that an adverse judgment in a prior *civil* case involving the same fraudulent conduct is not a permissible basis to reduce the prison sentence for the criminal fraud.  We agree.  The adverse civil judgment against Pennington is quite different from the substantial, voluntary restitution that we held a permissible basis for downward departure in United States v. Garlich, 951 F.2d 161, 163 (8th Cir. 1991).  Like the career loss factor held an impermissible basis for downward departure in Koon v. United States, 518 U.S. 81, 110 (1996), it is entirely foreseeable that fraud victims will seek to recover their damages in civil actions against fraud perpetrators.  Yet the Sentencing Commission did not cite an adverse civil judgment as a mitigating factor in sentencing for fraud in its lengthy Commentary to U.S.S.G. § 2F1.1, the very detailed Guideline for fraud offenses.  Instead, that Commentary, if anything, is to the

---

[5]Indeed, both Pennington and Oldner appear to have received a sentencing windfall when the district court improperly grouped their mail fraud and money laundering counts together.  See O'Kane, 155 F.3d at 971-74.  The government does not raise this issue on appeal.

[6]The district court did consider the punitive damage award in the civil case in deciding to sentence Pennington toward the bottom of his Guidelines range.

contrary. See § 2F1.1, comment. (backg'd) ("[a] defendant who has been subject to civil or administrative proceedings for the same or similar fraudulent conduct demonstrates aggravated criminal intent and is deserving of additional punishment"). This is strong evidence that an adverse civil judgment does not warrant a downward departure because it does not take a fraud case out of the heartland of § 2F1.1. Therefore, we conclude the district court did not abuse its discretion in deciding not to grant a downward departure from Pennington's Guidelines prison sentence. Of course, the question whether *satisfying* such a civil judgment should be taken into account in determining a criminal monetary penalty such as fine or restitution is not before us, and we do not consider it.

Finally, Pennington argues the district court committed a double counting error by adjusting his money laundering base offense level upward because he knew the laundered monies were fraud proceeds. See U.S.S.G. § 2S1.2(b)(1)(B). This contention is foreclosed by our contrary decision in United States v. Hare, 49 F.3d 447, 452 (8th Cir.), cert. denied, 516 U.S. 879 (1995).

B. Oldner. The district court granted Oldner a twenty-month downward departure based upon a combination of factors -- because Pennington's conduct involved a much greater breach of trust yet his Guidelines range was the same, Oldner's health problems, and his need to support his mother. The government cross-appeals this departure. Because the government did not object at sentencing, we review the departure for plain error. See United States v. Posters 'N' Things Ltd., 969 F.2d 652, 663 (8th Cir. 1992), aff'd, 511 U.S. 513 (1994). The government's contention on appeal that it had no notice of the district court's intent to depart is waived because it was not raised to the district court. See United States v. Barajas-Nunez, 91 F.3d 826, 830 (6th Cir. 1996).

To succeed under plain error review, the government must show there was a clear error affecting substantial rights that resulted in a miscarriage of justice. See

United States v. Olano, 507 U.S. 725, 735-36 (1993). The government argues the district court relied on an improper basis for the downward departure because Pennington's more serious breach of trust was accounted for in the Guidelines by his two-level enhancement for abuse of trust. In concluding that Pennington's and Oldner's comparable Guidelines ranges were inappropriate, the government explains, the court apparently overlooked the fact that Oldner's base offense level was enhanced by his conviction on the obstruction of justice count. Because the district court stated that Oldner's health and support of his mother do not by themselves warrant a departure, the departure is attributable to an impermissible factor and must be reversed.

Though this argument might well have had merit if timely presented to the district court, we conclude it does not entitle the government to plain error relief. The government challenges one of the departure factors the district court expressly considered in combination. We do not know whether the district court would have agreed with that challenge and, if so, how it would have affected the court's decision to depart. In these circumstances, we conclude that this downward departure, like the downward departure in United States v. Ragan, 952 F.2d 1049 (8th Cir. 1992), "did not result in a miscarriage of justice."

The judgments of the district court are affirmed.

A true copy.

    Attest:

        CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-13-