# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1788

_____

United States of America,                   *
                                               *

        Appellee,               *
                                               *

    v.                          *
                                               *

Stephen Michael Green,         *
                                             *

        Appellant.             *

<table>
<tr><td>_____</td><td rowspan="3">Appeals from the United States<br>District Court for the District<br>of Minnesota.</td></tr>
<tr><td>No. 99-1973</td></tr>
<tr><td>_____</td></tr>
</table>

United States of America,         *
                                             *

        Appellee,               *
                                               *

    v.                          *
                                               *

Thomas Arthur Green, Sr.,     *
                                             *

        Appellant.             *

_____

Submitted:  February 15, 2000

Filed:  September 13, 2000

_____

Before BEAM and JOHN R. GIBSON, Circuit Judges, and PRATT,[1] District Judge.
_____

PRATT, District Judge.

As a result of their participation in a telemarketing fraud, appellants were charged by grand jury indictment with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371, fifteen counts of devising and carrying out a scheme to defraud utilizing the wires in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). A jury found appellants guilty on all counts and found $830,000 subject to forfeiture pursuant to 18 U.S.C. § 982(a)(2)(A). In this consolidated appeal, appellants raise multiple challenges to their convictions and sentences. We have jurisdiction under 28 U.S.C. § 1291. We affirm the judgment of the District Court[2] in all respects.

I.

From 1991 to 1994, Thomas Green, Sr. and his nephew Stephen Green[3] ran a large-scale telemarketing scheme that ultimately defrauded more than 480 small business owners of over two million dollars. The scheme was simple. Around this time, major car manufacturers were not building many convertibles. The Greens incorporated a company that purported to be the largest manufacturer of convertible

_____

[1]The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

[3]Thomas Green, Jr., son of Thomas Green, Sr., was also involved in the scheme but does not appeal his conviction or sentence, which included a downward departure for diminished capacity.

conversion kits in the world. Such kits are used to turn hard-top automobiles into convertibles. The Greens then contacted auto body repair shops throughout the United States, and for a $40 fee, sent out a promotional video and confidential business plan they had produced. The video and plan represented that the company: manufactured and sold convertible conversion kits; was the largest manufacturer of such kits in the world; manufactured over 70 different kits; manufactured kits that were "original equipment manufacturer" quality; had received factory approvals from major manufacturers to install the kits; and would provide exclusive territories to qualified distributors. None of these representations were true.

After a shop owner received the video and plan, the Greens or other company telemarketers called to encourage the owner to send in an application to become a distributor, along with a $150 fee. After the Greens "approved" the application and deposited the fee, owners were called again and encouraged to wire transfer money to the company to secure their territory and to serve as a down payment toward the purchase of conversion kits. During these follow-up telephone calls, the Greens or other company telemarketers said: the company had conversion customers waiting in the area of the proposed distributorship; money had to be wired immediately or the territory would be sold to someone else; and the territory was exclusive. Again, these statements were not true. The Greens used multiple false names in these telephone conversations and on company documents. The name of the company itself was changed at least four times.

More than 480 auto body shop owners eventually became distributors at a cost ranging from $3,500 to $18,000 each, depending on the number of kits requested. The Greens received over two million dollars, but the company's inventory consisted of only some rusting frames and a few fabric tops. No usable kits were ever shipped. The Greens sold overlapping territories in many states, and no useful customer referrals were made. When owners attempted to contact the company to complain, inquire about a refund, or even simply to request information, they were told further lies.

During the life of this fraudulent telemarketing scheme, seven bank accounts were used by the Greens. The Greens reinvested a significant portion of the proceeds of the fraud into the scheme. They withdrew funds from the accounts, and one account in particular, to pay various expenses, including: production costs for the promotional video, shipping, telephone bills, salaries, intra-corporate transfers, and other office expenses such as rent, taxes, and advertising.

After an investigation and indictment, Thomas negotiated a plea agreement and twice attempted to plead guilty. The District Court twice rejected his plea as without sufficient factual basis. Following a nine-day trial, the jury convicted the Greens on all counts. The District Court sentenced Thomas to 135 months imprisonment and Steven to 144 months imprisonment based on the following offense level calculation applicable to both appellants. The District Court, after grouping Counts 1through 16 as closely related counts under Chapter 3, Part D, started with a base offense level of 6 for the wire fraud counts under U.S.S.G. § 2F1.1(a). The District Court then increased the level by 14 for specific offense characteristics, adding 12 levels under section 2F1.1(b)(1)(M) based on the amount of the fraud loss and 2 levels for multiple victims under section 2F1.1(b)(2)(B). To the adjusted offense level of 20 the District Court added 2 levels for role in the offense under section 3B1.1(c) and 2 levels for obstruction of justice under section 3C1.1, for a total offense level of 24 for the wire fraud counts. On Count 17, the money laundering count, the District Court calculated a base offense level of 23 under section 2S1.1(a)(1), increased the level by 4 for the specific offense characteristic of the value of the funds laundered under section 2S1.1(d)(2)(E), added 2 levels under section 3B1.1(c) for role in the offense, and added 2 levels for obstruction of justice under section 3C1.1, for a total offense level of 31. The District Court then combined the fraud group with the money laundering group under section 3D1.4, counting the money laundering group as 1 unit under section 3D1.4(a) and counting the fraud group as one-half unit under section 3D1.4(b), for a total offense level of 32. The District Court departed downward from III to II under section 4A1.3 when determining Thomas' criminal history, and sentenced him to a

number of months at the low end of the appropriate range. The District Court departed downward under section 4A1.3 to a criminal history category I for Stephen, and sentenced him to a number of months at the higher end of the appropriate range. The Greens were also each sentenced to three years supervised release, a special assessment of $850, and ordered to pay restitution, owed jointly and severally, in the amount of $1,426,436.95.

The Greens argue on appeal that the District Court erred in determining their sentences by failing to group the money laundering and fraud counts under U.S.S.G. § 3D1.2(b), and by miscalculating the value of the funds laundered under U.S.S.G. § 2S1.1. Thomas argues separately that the evidence at trial was insufficient to establish fraud, and that the District Court erred by rejecting his guilty pleas, increasing his sentence for obstruction of justice, and increasing his sentence for having an aggravating role in the offense. Steven argues separately that his sentence and the sentencing scheme for money laundering are unconstitutional, and that the District Court erred by finding his crime fell within the heartland for money laundering offenses. We have carefully examined each of the alleged errors and find them to be without merit. We will limit our discussion to the issue of grouping under section 3D1.2(b) of the Guidelines.

II.

When sentencing under the Guidelines, a district court determines the base offense level for each count under the applicable offense guideline in Chapter 2, and then adjusts that level for various factors listed in Chapter 3. See U.S.S.G. § 1B1.1(a), (b), (c). If there are multiple counts, the sentencing court must group closely related counts together to determine a single offense level as directed in Part D of Chapter 3. See U.S.S.G. § 1B1.1(d). The Greens appeal the District Court's failure to group their money laundering and fraud counts under U.S.S.G. § 3D1.2(b). We review the District Court's application of the Guidelines de novo. See United States v. Lewis, 200 F.3d

1177, 1178 (8th Cir. 2000). The District Court also found at each sentencing that the victims of the Greens' fraud and money laundering crimes differed. We review the District Court's findings of fact at sentencing for clear error. See United States v. Johnson, 169 F.3d 1092, 1098 (8th Cir.), cert. denied, --- U.S. ----, 120 S. Ct. 143 (1999).

Under section 3D1.2 of the Guidelines, all counts involving "substantially the same harm" should be grouped together for purposes of determining the offense level for the crimes. Counts involve substantially the same harm "[w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2(b). Therefore, to group counts under section 3D1.2(b), "the court must determine that the same person or entity was the victim of both crimes." United States v. O'Kane, 155 F.3d 969, 972 (8th Cir. 1998). In O'Kane, we carefully considered the issue and held that fraud and money laundering counts cannot be grouped under section 3D1.2(b) because those crimes have different victims. See id. at 972-73. The District Court, citing to O'Kane, did not group the Greens' money laundering and fraud counts. The Greens argue that the District Court misinterpreted O'Kane as applying to all kinds of money laundering. They urge us to limit O'Kane to "concealment" money laundering and to follow other circuits which have held that the victims of "reinvestment" or "promotion" money laundering are the same as the victims of the underlying fraud. See United States v. Leonard, 61 F.3d 1181 , 1186 (5th Cir. 1995); United States v. Cusumano, 943 F.2d 305, 313 (3d Cir. 1991), cert. denied, 502 U.S. 1036 (1992); United States v. Emerson, 128 F.3d 557, 565-66 (7th Cir. 1997). For the following reasons, we hold the analysis in O'Kane applicable to all types of money laundering.

Concealment money laundering refers to a violation of 18 U.S.C. § 1956(a)(1)(B)(i), which prohibits measures used to conceal or disguise illegal proceeds from detection, while reinvestment money laundering refers to a violation of 18 U.S.C. § 1956(a)(1)(A)(i), which prohibits the reinvestment of illegal proceeds into the

unlawful scheme. See United States v. Hildebrand, 152 F.3d 756, 762-63 (8th Cir. 1998). We first note that the defendant in O'Kane did not plead guilty to a violation of either concealment or reinvestment money laundering under 18 U.S.C. § 1956, but instead pleaded guilty to a violation of 18 U.S.C. § 1957, engaging in monetary transactions in property derived from unspecified unlawful activity. Neither the language nor analysis of O'Kane distinguishes between these types of money laundering.

O'Kane defrauded his employer of over $300,000 worth of baseball cards and used some of his profit from the sale of those cards to purchase various items for personal use, including a computer and a pickup truck. See O'Kane, 155 F.3d at 970. When examining whether fraud and money laundering have the same victim, we look first to the Guidelines to determine the purpose of the grouping rules. See id. at 972. "The Sentencing Commission intended the grouping rules to 'limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct.'" Id. (quoting U.S.S.G., Ch.3, Pt. D, into. comment.). "Defrauding one's employer is not offense conduct substantially identical to laundering part of the proceeds of that fraud, and the court moved far beyond 'limit[ing] the significance of the . . . charg[e]' by grouping the counts in a manner which punishes O'Kane solely for his money laundering, with no additional punishment for his fraud." Id. (quoting U.S.S.G., Ch.3, Pt. D, into. comment.). Grouping fraud and money laundering counts, therefore, "defeats the express purpose of Part 3D, 'to provide incremental punishment for significant additional criminal conduct.'" Id. (quoting U.S.S.G., Ch.3, Pt. D, into. comment.). This analysis applies equally to reinvestment money laundering as to money laundering under section 1957. If the District Court had grouped the money laundering and fraud counts under section 3D1.2(b), the offense level for the Greens' crimes would have been 31, thereby only punishing the Greens for their money laundering. See U.S.S.G. § 3D1.3(a). As actually calculated by the District Court, however, the total offense level was increased incrementally by only 1 level to reflect the additional harm caused by the fraud.

We also consider the examples listed in the Guidelines to determine whether fraud and money laundering counts are closely related for purposes of grouping. See O'Kane, 155 F.3d at 972. The examples indicate that multiple counts of fraud are properly grouped together. See id. (citing U.S.S.G. § 3D1.2 comment. (n.4)). We stated, however, that "O'Kane's separate offenses are not so closely interrelated as to justify grouping under (b). The offenses entail different kinds of proscribed conduct, punishable on different scales, which harm distinct and different victims." Id. While reinvestment money laundering is clearly more closely related to the underlying fraud than other kinds of money laundering, the offenses still entail different proscribed conduct, are punishable on different scales, and harm distinct and different victims. And as mentioned above, for counts to be considered closely related under section 3D1.2(b) they must involve the same victim and be part of a common scheme or plan. The counts might seem closely related because the money is being reinvested in the fraud, but that merely satisfies the second requirement of section 3D1.2(b) that the offenses are part of the same scheme or plan. Reinvestment itself does not make the victim of money laundering the same as the victim of fraud, although it certainly allows the criminal to increase the number of his fraud victims.[4] As we observed, O'Kane's use of the truck on occasion to continue his fraud by hauling stolen baseball cards from his employer's premises "does not change the legal conclusion that he harmed a different victim by his money laundering than by his fraud." Id. at 973.

The Greens cite to Leonard, 61 F.3d at 1186, and Cusumano, 943 F.2d at 313, both of which hold that reinvestment money laundering has as its "specific victim" the same victim as the underlying fraud. We have expressly declined to follow these two cases. See O'Kane, 155 F.3d at 972.

---

[4]Because reinvested proceeds generate further criminal activity, reinvestment money laundering has a higher base offense level than concealment money laundering or money laundering under section 1957. See Hildebrand, 152 F.3d at 763.

Fraud clearly harms the defrauded. But money laundering harms society's interest in discovering and deterring criminal conduct, because by laundering the proceeds of crime, the criminal vests that money with the appearance of legitimacy. . . . Therefore, we choose to follow those circuits which have held that money laundering invades a distinct societal interest.

Id. at 972-73; see also, United States v. Woods, 159 F.3d 1132, 1136 (8th Cir. 1998) (agreeing with O'Kane "that bankruptcy fraud and money laundering invade different interests"). Whether the criminal uses the funds to buy a truck for personal use or to pay for production of a fraudulent video, money laundering invades society's interest in deterring and detecting crime. In both cases the funds have been given the appearance of legitimacy through laundering. We hold the District Court did not err by refusing to group the Greens' reinvestment money laundering counts with the underlying fraud counts. We affirm the District Court's interpretation of the Guidelines and find no clear error as to its factual conclusions.

III.

We have considered all claims of error raised by appellants and, after thorough examination of the record, find them to be without merit. Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-9-