UNITED STATES of America,
Appellee,

v.

John NAPOLI, a/k/a John Bianco, a/k/a "Vince," Defendant–Appellant,

Barry D. Pincus; Robert San Filippo; Darrin Wigger, Defendants.

Docket No. 98–1124.

United States Court of Appeals,
Second Circuit.

Argued Dec. 14, 1998.

Decided April 28, 1999.

**3**

Azra Rayches Feldman, Feldman and Feldman, Rosyln, New York, for Defendant–Appellant.

Debra Newman, Assistant United States Attorney, Brooklyn, New York (Zachary W. Carter, United States Attorney for the Eastern District of New York, Emily Berger, David C. James, Jo Ann Navickas, Assistant United States Attorneys, on the brief), for Appellee.

Before: FEINBERG, CALABRESI and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge:

Following a jury trial in the United States District Court for the Eastern District of New York (Mishler, J.), John Napoli was convicted of one count of conspiracy to commit wire fraud and money laundering in violation of 18 U.S.C. § 371, twenty-one counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B), nine counts of wire fraud in violation of 18 U.S.C. § 1343, one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 371, and one count of bank fraud in violation of 18 U.S.C. § 1344. The district court sentenced Napoli principally to 210 months imprisonment and 36 months supervised release. Napoli appeals his conviction on grounds that we reject in a summary order issued simultaneously with this opinion. *United States v. Napoli*, No. 98–1124, 1999 WL 265024, 173 F.3d 847 (9th Cir.1999). In this opinion, we address only Napoli's sentencing claims.

Napoli maintains on appeal that the district court erred by (1) failing to group his convictions for wire fraud and money laundering as "related" counts under § 3D1.2 of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"); [1] (2) failing to treat two of his prior convictions

---

1. We apply the 1997 edition of the Guidelines in effect on the date of Napoli's sentencing. Except where otherwise indicated, all references to statutory sections are references to the Guidelines.

that were consolidated for sentencing as "related" under § 4A1.2; (3) assigning him a four-level offense level increase as an organizer or leader of a criminal activity under § 3B1.1(a); (4) assigning him criminal history points for three prior convictions under §§ 4A1.1 and 4A1.2(e); and (5) declining to depart downwardly because of his heart impairments and cooperation with state law enforcement authorities.

We hold that the district court properly decided not to group Napoli's wire fraud and money laundering counts of conviction and affirm the court's treatment of these counts as "unrelated" under § 3D1.4. We also hold that prior convictions, administratively consolidated for sentencing after a transfer under Rule 20 of the Federal Rules of Criminal Procedure ("Rule 20"), should be treated as unrelated when the convictions are factually different. We therefore affirm the district court's treatment of Napoli's prior convictions as "unrelated" under § 4A1.2. Napoli received an incarceration sentence for one of these convictions that was later reduced to probation, however, and we remand for the district court to determine whether it properly assigned Napoli criminal history points for that conviction. We reject all of Napoli's remaining challenges to his sentence and affirm the district court's rulings.

## BACKGROUND

### A. The Trial

According to the government's witnesses at trial, including Napoli's three accomplices—i.e., Robert San Filippo, Darrin Wigger and Barry Pincus, all of whom had signed cooperation agreements with the government—Napoli devised a scheme to lure buyers in foreign countries into making sizeable deposits for the delivery of large quantities of cigarettes. Napoli, however, had neither a supply of cigarettes nor the intention of delivering any. In February 1995, the first buyer, Evangelist Gatzones, sent Napoli's accomplice, San Filippo, a deposit in the form of a cash-ier's check in the amount of $100,000. Napoli instructed San Filippo to deposit the check at Trump Plaza casino in Atlantic City, New Jersey, and to gamble a portion of it without losing more than $10,000. San Filippo followed these instructions and gave Napoli a remaining $91,000 cash balance the next day.

Because the second buyer, Irena Fishman, hesitated to give a deposit without any security, Napoli arranged for the deposit to be held in escrow with Pincus, a lawyer, pending confirmation of the buyer's receipt of the promised cigarettes. Satisfied with this security, Fishman sent San Filippo a certified check on February 27, 1995, in the amount of $60,000 for deposit into Pincus's escrow account. Initially, Pincus refused to give Napoli the funds in escrow until Napoli delivered the goods. Pincus released the monies, however, after Napoli threatened to kill him. Once again, Napoli instructed San Filippo to gamble a portion of this money at Trump Plaza casino. San Filippo lost $50,000 and gave the remainder to Napoli in cash.

On March 18, 1993, Fishman sent Pincus another certified check in the amount of $100,000. Another buyer, Romeo Wälser, also deposited a certified check in the amount of $600,000 in Pincus's escrow account. Napoli directed Pincus to write a check payable to the Trump Taj Mahal casino in the amount of $180,000, which Pincus did. San Filippo then deposited the check at the casino and tried to withdraw the money, but the casino permitted only an initial withdrawal of $50,000. After San Filippo won $15,000 gambling, Napoli ordered San Filippo to demand the release of the rest of their funds. San Filippo made the demand and the casino complied nine days later, after the deposited check had cleared. San Filippo and Wigger delivered the money to Napoli after their return from Atlantic City.

Between April 5, 1995 and July 31, 1995, checks sent by other buyers to Pincus's

escrow account were transferred into Wigger's Off Track Betting account and into various other accounts at banks and at Merrill Lynch. At Napoli's direction, those funds were then withdrawn and given to him. Napoli used a portion of these funds to finance a gourmet market and his daily living expenses.

In order to explain his wealth during the time of the charged conspiracy, Napoli presented trial witnesses who testified about his successful history as a gambler. At the end of the trial, the jury convicted Napoli on all counts.

## B. The Sentencing

Prior to his sentencing, Napoli raised various objections to the offense level and criminal history calculations contained in his Pre–Sentence Report ("PSR"), all of which the district court rejected in a written opinion dated February 25, 1998. First, Napoli argued that his wire fraud and money laundering counts should have been grouped as "related counts" under § 3D1.2. Napoli maintained that the PSR's treatment of these counts as "unrelated" under § 3D1.4 thus resulted in an improper one-level enhancement to his base offense level. The district court rejected Napoli's contention, citing, without discussion, *United States v. Lombardi*, 5 F.3d 568 (1st Cir.1993), and *United States v. Harper*, 972 F.2d 321 (11th Cir.1992) (per curiam).

Second, Napoli claimed that his base offense level should have been enhanced by only two levels for his leadership role in the offense because his criminal activity involved less than five participants and was not "otherwise extensive." The district court disagreed, finding that the combination of four knowing participants with numerous other unknowing participants qualified Napoli's scheme as "otherwise extensive" and justified a four-level leadership enhancement under § 3B1.1(a).

Third, Napoli maintained that two of his prior sentences, which had been administratively consolidated for sentencing pursuant to Rule 20, were "related" as that term is defined in 4A1.2(2), thereby qualifying him for three less criminal history points than the six recommended in his PSR. The district court, however, held that the facts of the two prior crimes, as set forth in the PSR, "clearly show[ed] that the crimes were unrelated" for purposes of § 4A1.2(2).

Fourth, Napoli challenged the PSR's assignment of one criminal point each to three other of his prior convictions. Napoli argued that the sentences for those convictions should have been deemed as imposed more than ten years before the commencement of the instant offense, and that for this reason, these convictions should not have been counted as part of Napoli's criminal history points under § 4A1.1 and § 4A1.2(e). Without addressing Napoli's arguments, the district court simply adopted the PSR's calculations.

Finally, Napoli sought a downward departure under §§ 5H1.4, 5K1.1 or 5K2.0 because of his poor heart condition and his cooperation with state law enforcement agencies. The district court held that in the absence of a § 5K1.1 downward departure motion by the government, the court lacked authority to depart and that even if it had such authority, it would decline to use it because Napoli's seeming cooperation was only a "means for facilitating his criminal activities." In particular, the court found that during his cooperation with state authorities, Napoli stole $120,000 of government funds and supplied government agents with "bogus narcotics" in the undercover transactions in which they were engaged. The district court also considered, but rejected, Napoli's heart condition as a ground for departure after determining that the Bureau of Prisons, which had treated Napoli since his arrest in December 17, 1996, had the ability to provide adequate care for Napoli's condition.

For the reasons discussed in its written opinion and at sentencing, the district court adopted the factual findings of the

PSR and its offense level and criminal history calculations. The court sentenced Napoli to 210 months' of imprisonment, followed by three years of supervised release, restitution in the amount of $1,199,400, and a special assessment of $1,650. This appeal followed.

## DISCUSSION

### I. Standard of Review

■ We review the factual determinations underlying the district court's application of the Sentencing Guidelines under the clearly erroneous standard, but we review the court's legal interpretation of the Guidelines *de novo*. *See United States v. Azeem*, 946 F.2d 13, 15 (2d Cir.1991).

### II. The Offense Level Challenges

#### A. Grouping of the Fraud and Money Laundering Counts

U.S.S.G. § 3D1.1 establishes a three step procedure for determining total combined offense levels in cases of multiple count convictions: (i) all counts are separated into "groups" of "closely related" counts in accordance with the rules set forth in § 3D1.2, which allow for single as well as multiple-count groups; (ii) the count with the highest offense level in each group is used to determine that group's offense level in accordance with the rules set forth in § 3D1.3; and (iii) if application of § 3D1.2 results in more than one group, then, in accordance with the rules set forth in § 3D1.4, each group is assigned a number of "units," and these units are used to increase the offense level of the group with the highest offense level, thus producing a "total combined offense level" for the entire multi-count conviction. In this case, the district court grouped Napoli's fraud counts separately from his money laundering counts under § 3D1.2. The district court then assigned units to each group, which added one offense level to Napoli's money laundering group under § 3D1.4.

■ Napoli argues that the district court should have placed his fraud and money laundering counts into a single group of related counts under both subsections (b) and (d) of § 3D1.2. This section provides that:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Offenses covered by the following guidelines are to be grouped under this subsection:

§§ 2B1.1 [larceny or embezzlement], 2B1.3 [destruction of property], 2B4.1, 2B5.1, 2B5.3, 2B6.1;

. . .

§§ 2D1.1 [drug trafficking], 2D1.2, 2D1.5, 2D1.11, 2D1.13; .

. . .

§§ 2F1.1 [fraud or forgery], § 2F1.2 [insider trading];

. . .

§§ 2S1.1 [money laundering], 2S1.2 [dealing with criminally obtained funds];

§§ 2T1.1 [tax evasion], 2T1.4, 2T1.6, 2T1.7, 2T1.9, 2T2.1, 2T3.1.[2]

U.S.S.G. § 3D1.2.

This Circuit has not yet addressed the question of when, if ever, fraud and money laundering counts should be grouped. It is a question that has split many of our sister circuits. Compare, e.g., *United States v. Wilson*, 98 F.3d 281, 283 (7th Cir.1996) (grouping where "the money laundering took place in an effort to conceal the fraud and keep the entire [Ponzi] scheme afloat"); *United States v. Mullens*, 65 F.3d 1560, 1564 (11th Cir.1995) (grouping where fraud and money laundering were "integral cogs in [a] continuing ... scheme"); *United States v. Leonard*, 61 F.3d 1181, 1186 (5th Cir.1995) (grouping where fraud and money laundering "constituted part of the same continuing common criminal endeavor"), with, e.g., *United States v. Hildebrand*, 152 F.3d 756, 763 (8th Cir.), cert. denied sub nom. *Webb v. United States*, ―― U.S. ――, 119 S.Ct. 575, 142 L.Ed.2d 479 (1998) (refusing to group because fraud and money laundering "do not measure the same types of harm"); *United States v. O'Kane*, 155 F.3d 969, 972–73 (8th Cir.1998) (refusing to group because fraud and money laundering guidelines measure harm differently); *United States v. Kunzman*, 54 F.3d 1522, 1531 (10th Cir.1995) (refusing to group because fraud and money laundering involve different classes of victims); *Lombardi*, 5 F.3d at 570 (refusing to group because fraud and money laundering harm different classes of victims). We hold that in the circumstances of this case, the district court was correct to apply § 3D1.4 and calculate Napoli's sentence on the basis of separate groups for his fraud and money laundering counts.

### (a) § 3D1.2(b): Same Victim and Common Criminal Objective, Scheme or Plan

As an initial matter, because § 3D1.2(b) only allows for grouping when counts involve the same victim, we reject Napoli's argument that his fraud and money laundering counts should have been grouped under this subsection. See § 3D1.2(b) (allowing for grouping only when "counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan"). Application Note 2 to § 3D1.2 explains that:

> [t]he term "victim" [as used in § 3D1.2(a) and (b) ] is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim. For offenses in which there are no identifiable victims (e.g., drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsections (a) and (b) is the societal interest that is harmed.

■ The "victims" of fraud counts are those persons who have lost money or property as a direct result of the fraud. *See, e.g., United States v. Kaye*, 23 F.3d 50, 53–54 (2d Cir.1994) (identifying victim of fraud as person who has lost assets because of the fraud). The "victim" of money laundering is, by contrast, ordinarily society at large. *See, e.g., Harper*, 972 F.2d at 322 (remarking that money laundering invades societal, rather than individual, interests); *United States v. Lopez*, 104 F.3d 1149, 1150 (9th Cir.1997) (per curiam) (remarking that money laundering is a "victimless crime" that harms society in general). Society is harmed when, for example, the ill-gotten gains from a crimi-

**2.** Subsection (d) also lists a series of counts that are "[s]pecifically excluded from the operation of this subsection," including all offenses against persons, *see* Chapter 2, Part A, most other crimes, including property crimes, that involve violence or the threat of violence, *see, e.g.,* §§ 2B3.1 (robbery), § 2B3.2 (extortion), and a set of others crimes excluded mainly for policy reasons, *see, e.g.,* § 2D2.1 (narcotics possession).

nal enterprise are allowed to be used for profit, the sources of these funds are concealed from police investigation or criminals are allowed to "disperse[ ] capital from lawfully operating economic institutions to [other] criminals in and out of the country." *United States v. Gallo*, 927 F.2d 815, 824 (5th Cir.1991); *see also O'Kane*, 155 F.3d at 972 (stating that "money laundering harms society's interest in discovering and deterring criminal conduct, because by laundering the proceeds of crime, the criminal vests that money with the appearance of legitimacy"). Because we find that Napoli's fraud and money laundering counts involved different harms to different victims, they cannot be grouped under subsection (b). *See Lombardi*, 5 F.3d at 570 (refusing to group fraud and money laundering counts under subsection (b) because "the victim of fraud is the insurance company and the victim of money laundering is society"); *Kunzman*, 54 F.3d at 1531 (refusing to group fraud and money laundering counts under subsection (b) because "the 'victim' of fraud, the defrauded individual, is not the same as the 'victim' of money laundering, society in general").[3]

3. We need not decide here whether we agree with those circuits that have held that the function of money laundering can sometimes be so highly interwoven into a fraud scheme that the fraud victim is the direct victim of the money laundering as well, and the counts should be grouped together. *See, e.g., United States v. Walker*, 112 F.3d 163, 167 (4th Cir. 1997) (grouping where the "[laundered] funds were used to make fictitious interest payments," which were necessary for the continuing fraud, and because the "money laundering was [thus] part of [the defendant's] fraudulent scheme"); *Wilson*, 98 F.3d at 283 (grouping where "the money laundering took place in an effort to conceal the fraud and keep the entire scheme afloat"); *Mullens*, 65 F.3d at 1564 (grouping where "the fraud and the money laundering were integral cogs in continuing the scheme," and in part because "[l]aundering money by returning false profits to some investors and paying expenses to maintain a facade of success enabled [the defendant] to attract new investors and keep old investors from discovering his deceit"); *Leonard*, 61 F.3d at 1186 (grouping where "the group of targeted victims became the

### (ii) § 3D1.2(d): Offense Level Based on Aggregate Harm or Guideline Written to Cover Continuous Behavior

■ Napoli also argues that his fraud and money laundering counts should have been grouped under § 3D1.2(d), which requires grouping when "the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of *aggregate harm*, or if the offense is ongoing or continuous in nature and the offense guideline is written to cover such behavior." Whether Napoli's fraud and money laundering counts should have been grouped together under this subsection presents a more difficult question.

■ Some circuits have held that fraud and money laundering counts cannot be grouped under subsection (d) for precisely the same reasons that we reject grouping under subsection (b), namely, that the crimes involve different victims. *See, e.g., United States v. Johnson*, 971 F.2d 562, 576 (10th Cir.1992); *cf. also United States v. McElroy*, 910 F.2d 1016,

victim of the money laundering activity as well as the fraud scheme"). Napoli's laundering activities were only integrated into his fraud scheme insofar as he lured individual victims into the fraud by leading them to believe that their deposits were secure in Pincus's escrow account. Napoli also, however, used casinos, gambling and other accounts to disperse the proceeds of the fraud for personal use. This activity invaded the precise societal interests that Congress had in mind when it passed the Money Laundering Control Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207 (codified as amended at §§ 18 U.S.C. 1956–1957), and society was thus "directly and most seriously affected" by Napoli's gambling and banking activities. *See United States v. LeBlanc*, 24 F.3d 340, 346 (1st Cir. 1994) (noting that Congress passed the Money Laundering Control Act of 1986 in order to add punishment for "conduct that follows in time the underlying crime *rather than to afford an alternative means of punishing the prior 'specified unlawful activity'* " (emphasis added) (quoting *United States v. Johnson*, 971 F.2d 562, 569 (10th Cir.1992))).

1026–27 (2d Cir.1990) (declining to group receipt of bribes and acceptance of bribes under § 3D1.2(d) because different victims and property were involved in the two sets of crimes). It would be wrong, however, to project a same-victim requirement into § 3D1.2(d). First, no such requirement is mentioned in subsection (d); we find this omission especially telling in light of the fact that subsections (a) and (b) both explicitly require harm to the "same victim." Moreover, the Background to § 3D1.2's Commentary states that counts "involving different victims (or societal harms in the case of 'victimless' crimes) are grouped together *only* as provided in subsection . . . (d)." (Emphasis added.) Finally, Application Note 6 to subsection (d) gives examples of counts that should be grouped under that subsection, including cases in which a "defendant is convicted of two counts of theft of social security checks and three counts of theft from the mail, *each from a different victim*." (Emphasis added.) Unlike with subsection (b), the mere fact that Napoli's fraud and money laundering counts harmed different victims is therefore insufficient to establish that these counts cannot be grouped under subsection (d).[4]

■ The most promising argument for grouping under subsection (d) derives from the fact that the guidelines for both fraud and money laundering measure some part of their respective harms in terms of monetary values. In summarizing the "essence" of the multi-count rules, the Introductory Commentary to Chapter 3, Part D of the Guidelines explains that "[i]f the offense guidelines [for two counts] base the offense level primarily on the amount of money . . . involved . . . add the numerical quantities [associated with each] and apply the pertinent offense guideline, including any specific offense characteristics for the conduct taken as a whole." Section 3D1.2(d) also states that counts involving harms to different victims should be grouped "[w]hen the offense level [for each count] is determined largely on the basis of the total amount of harm or loss . . . or some other measure of aggregate harm . . . ."[5] Often, individual counts

---

**4.** We also, however, reject the broad view that money laundering and fraud counts can be grouped under subsection (d) simply because they both appear on its list of counts "to be grouped." *Cf. United States v. Emerson,* 128 F.3d 557, 564 n. 1 (7th Cir.1997) ("There is some question whether all of the offense sections listed under § 3D1.2(d) are to be grouped with each other, or if only those sections listed in the same row are to be grouped together."); *Harper,* 972 F.2d at 322 ("Subsection (d) goes on to categorize offenses . . . that should be grouped for sentencing . . . ."). Although fraud (§ 2F1.1) and money laundering (§ 2S1.1) are listed as "to be grouped" under subsection (d), the same list contains other counts that measure the harms they seek to punish in entirely different ways. For example, although fraud (§ 2F1.1) and drug trafficking (§ 2D1.1) appear on the list, the harm generated by fraudulent activity is measured in dollar losses to individuals, *see* § 2F1.1(b)(1), whereas the harm generated by drug trafficking is measured in amounts of controlled substances, *see* §§ 2D1.1(a)(3) & (c). Because the guidelines for each of these offenses measure harm differently, it would be impossible to use either guideline to determine an offense level based on the "total" or "aggregate" harm from both-as is required

when counts are grouped under subsection (d). This observation persuades us that the mere appearance of fraud and money laundering on subsection (d)'s list of counts "to be grouped" is insufficient to establish that they should be placed in a single group.

**5.** Section 3D1.2(d) also allows for grouping when the offense behavior is "ongoing or continuous in nature and the offense guideline is written to cover such behavior." Although this language does not explicitly reference a notion of "aggregation," a guideline that is "written to cover ongoing or continuous behavior" is a guideline that by its specific offense characteristics adds offense levels with reference to all the harm caused by an ongoing behavior. *See United States v. Mizrachi,* 48 F.3d 651, 656 (2d Cir.1995) (approving the grouping of arson and fraud counts arising from a scheme to defraud an insurance company under subsection (d) because the arson guideline, § 2K1.4(a)(3), includes specific offense characteristics for the amount of a fraud related to an arson); *see also* Introductory Commentary to Ch. 3 Part D (instructing that when offense guidelines "otherwise contain provisions dealing with repetitive or ongoing misconduct (*e.g.,* many

grouped under subsection (d) involve different individual victims, as in the case of five frauds to five persons. In such cases, the dollar amount associated with each count measures the harm to each independent victim, and the "total harm" is calculated by adding up all these numbers. *See, e.g.*, Illustration 4 to § 3D1.5 (Where defendant "convicted of four counts arising out of a scheme pursuant to which he received kickbacks from subcontractors"— *i.e.*, two counts involving mail fraud, one involving ordinary fraud and one involving commercial bribery—add the "money involved" and apply the guideline that produces the highest offense level for this total.) At other times, some of the counts grouped under subsection (d) involve essentially one harm to one victim. In such cases, the counts should first be grouped under subsection (a) and the one harm to the one victim should be counted only once when adding the different harms to the different victims. *See* Application Note 7 to § 3D1.2 ("A single case may result in application of several of the rules in this section. [One] example . . . in the discussion of subsection (d) involves an application of § 3D1.2(a) followed by an application of § 3D1.2(d).").[6] In either case, however, grouping under subsection (d) essentially involves the aggregation of the various harms to all victims and a consequent determination of the "total harm or loss" to be associated with the group. The best argument for grouping Napoli's fraud and money laundering counts under this subsection therefore derives from the fact that both measure harm in seemingly aggregable amounts of money.

Several other considerations persuade us, however, that grouping of these two

counts was never intended under subsection (d). In particular, Application Note 6 to § 3D1.2 states that two counts that measure harm in quantities should only be grouped if the counts are also of the "same general type." Although the Guidelines are not altogether explicit about how to identify counts of the "same general type," they do provide several valuable clues, and none of them speaks in favor of grouping Napoli's fraud and money laundering counts with one another.

First, as noted earlier, the Introductory Commentary to Chapter 3, Part D directs that with regard to different guidelines that measure harm in monetary values, counts should be grouped, and their numerical quantities added, only when the "offense guidelines [for the two counts] base the offense level *primarily* on the amount of money . . . involved." (Emphasis added.) The offense level for money laundering is not, however, based primarily on the amount of money involved. To see this, one should recognize that the guidelines for different offenses generally determine offense levels by, first, beginning with a "base offense level" (which measures society's initial disapprobation for the type of activity in question) and then adding certain "specific offense level" increases (which reflect either the amount of harm caused by a specified activity or other relevant disapproved conduct, such as harm to multiple victims). With regard to counts that can be grouped under subsection (d), the amount of harm is, in turn, measured primarily in quantities of certain fungible items, such as money or grams of narcotics, with the total offense level increasing as the money or weight increases.

environmental offenses), [sentencing courts should] add the numerical quantities and apply the pertinent offense guideline. . . .").

6. Application Note 6 to § 3D1.2 provides an example of this process:

[A] defendant is convicted on two counts of check forgery and one count of uttering the first of the forged checks. All three counts are to be grouped together. *Note, however, that the uttering count is first*

*grouped* with the first forgery count *under subsection (a)* of this guideline, *so that the monetary amount of that check counts only once* when the rule in § 3D1.3(b) is applied. (Emphases added.) When two counts measure harms to two different victims, however, the quantities associated with each count must be added to one another. *See* Introductory Commentary to Ch. 3 Part D.

Importantly, fraud and all the other offenses explicitly mentioned in the Guidelines as of the "same general type"—*i.e.*, larceny, embezzlement and forgery [7]—set their base offense levels either at 4 (larceny and embezzlement) or 6 (fraud and forgery). The guidelines then add specific offense levels for certain monetary values, beginning at $100 (larceny and embezzlement) or $2,000 (fraud and forgery), and allowing for up to 18 (larceny and embezzlement) or 20 (fraud and forgery) additional levels, or up to 333% to 450% of the base offense level. Thus, the total offense level for fraud, as well as for every other count that is explicitly mentioned in the guidelines as of the "same general type," depends primarily on the amount of monetary loss involved.

By contrast, the guideline for money laundering sets the base level for that offense at either 20 or 23, depending on whether the laundering was used to promote or only conceal the underlying criminal activity, respectively. *See* § 2S1.1(a). The guideline then adds specific offense levels for the amount of money laundered, but begins increasing offense levels only when the amount laundered exceeds $100,000 and only allows for up to 13 additional levels (or up to approximately 60% of the base offense level)—*i.e.*, when the laundered amount exceeds $100 million. *See* § 2S.1(b)(2). Thus, even for the largest money laundering scheme, the total offense level will be based primarily on the base offense level, which reflects society's disapprobation of the activity, rather than

on the amount of money involved. It is worth noting in this respect that the Guidelines never give any examples that involve the grouping of money laundering with fraud, forgery or any of the coordinated property crimes. *Cf. O'Kane*, 155 F.3d at 972 ("[W]e do not simply squint at shadows on a dark wall; the Guidelines provide clear examples of the types of counts which should be grouped under Section 3D1.2(b)."). These facts suggest that although fraud and money laundering both measure their respective harms in part in amounts of money, the two crimes might not otherwise meet the criteria for being of the "same general type" because only the offense level for fraud is based "primarily" on these quantities.

Moreover, Application Note 3 to § 3D1.3 explains that the guidelines for similar property offenses, which are all of the "same general type," "have been *coordinated* to produce identical offense levels, at least when substantial property losses are involved." (Emphasis added). For example, all the counts discussed above that are of the "same general type"—*i.e.*, fraud, larceny, embezzlement, forgery—use tables that translate the amount of "losses" involved into specific offense level increases at exactly the same rate, and at exactly the same monetary division points, beginning at $2,000. *See* § 2B1.1(b)(1) (larceny and embezzlement); § 2F1.1(b)(1) (forgery and fraud).[8] The guidelines for fraud and money laundering, by contrast, contain tables that translate monetary values into specific offense level increases at different

---

**7.** Application Note 6 to § 3D1.2 states that "[t]he 'same general type' of offense is to be construed broadly, and would include, for example, larceny, embezzlement, forgery, and fraud."

**8.** A vast number of crimes involving dollar losses are calibrated by reference to the tables either for embezzlement (§ 2B1.1) or fraud (§ 2F1.1). The table in § 2B1.1 marks out denominations for amounts of (i) $100 or less and (ii) more than $100 but no more than $1000, whereas the table in § 2F1.1 begins with the denomination of $2000 or less. After this point, however, both tables translate

monetary amounts into total offense levels at exactly the same rate and at exactly the same monetary division points. These minor differences at the beginning of these tables should not be taken to mean that counts referring to them are not of the "same general type." After noting that the guidelines for similar property crimes have been "coordinated," Application Note 3 to § 3D1.3 states that "when small sums are involved, the differing specific offense characteristics that require increasing the offense level to a certain minimum may affect the outcome."

rates, and at different monetary division points. Between a fraud of $100,000 and one of $100,000,000, there is, for example, a 12 offense-level difference, *see* § 2F1.1(b)(1); whereas between two money laundering schemes of the same amounts, there is a difference of 13 levels, *see* § 2S1.1(b)(2). Although the difference between a 12–offense level gap and a 13 offense-level gap is relatively small, even that small difference translates into a significant result at sentencing. To translate the harm to defrauded individuals that is measured in dollar losses by means of the money laundering tables would therefore exaggerate the amount of punishment that the Guidelines normally deem appropriate for such losses. This result should not be altogether surprising, given that fraud counts use monetary amounts to measure the value of loss to victims, whereas money laundering counts use monetary amounts to measure "the magnitude of the criminal enterprise, and the extent to which the defendant aided the enterprise." § 2S1.1 commentary; *see also* § 2B1.1 commentary n. 2; § 2F1.1 commentary note 7 (defining "loss" for fraud as equivalent to the notion of "loss" involved in property crimes). These facts suggest, once again, that fraud and money laundering counts are not of the "same general type."

Finally, grouping fraud and money laundering counts would produce an anomalous result in an important class of cases: *viz.*, where only a small portion of the funds obtained by a fraud scheme are thereafter laundered, as when a defendant fraudulently obtains $1,000,000 but launders only $100,000 of that money. If the two counts in this example were not grouped, the defendant's fraud count would be assigned a total offense level of 19 (*i.e.*, for frauds involving more than two victims and more

than $800,000 but no more than $1,500,000) under § 2F1.1, and his money laundering count would be assigned a total offense level of 20 (*i.e.*, for laundering $100,000 or less) under § 2S1.1. After these counts were assigned units and combined under the rules set forth in § 3D1.4, the defendant would receive a total combined offense level of 22. If, however, the two counts were grouped and their harms aggregated under § 3D1.2(d), the defendant would receive a total combined offense level that is equal to that of a money laundering charge for $1,100,000. This would, in turn, result in sentence based on a total offense level of 25 (*i.e.*, for laundering more than $1,000,000 but no more than $2,000,000), which is 3 points higher than if the counts were not grouped. Thus, grouping—which is meant to protect defendants against arbitrary additions resulting from the government's formal charging decision—would actually increase the defendant's sentence, and this problem occurs systematically in cases where only a small portion of the funds obtained from a fraud victim are laundered.

■ Contrary to Napoli's view of the matter, grouping would not help him even in the present circumstances. Napoli's fraud counts amounted to approximately $1.6 million in loss to individuals, and he laundered $1.3 million of this money. Napoli committed two separate types of crimes, however, at separate times and harming two separate types of victims. The "total" or "aggregate" harm associated with the crimes would thus be set at approximately $2.9 million. *See, e.g.*, *O'Kane*, 155 F.3d at 973 (holding that defendant who defrauds his employer of $304,667 but only launders $73,562.50 "would be punished for laundering the total sum of $378,229.50").[9] Whether or not

9. Contrary to defendants contentions here, this sort of aggregation would not constitute illicit "double counting." "Impermissible double counting occurs when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another

part of the guidelines." *United States v. Dudley*, 102 F.3d 1184, 1186 (11th Cir.) (per curiam), *cert. denied sub nom. Wilson v. United States*, 520 U.S. 1203, 117 S.Ct. 1567, 137 L.Ed.2d 712 (1997). Counting the $1.3 million twice in this case would, however, be nothing more than a straightforward aggrega-

Napoli's counts were grouped, his sentence would thus remain the same. If these counts were grouped, for example, Napoli would receive a base offense level of 20 and 6 additional levels (*i.e.*, for laundering [10] more than $2 million but no more than $3.5 million). *See* § 2S1.1. This would, in turn, yield a total offense level of 26. *See id.* If, however, the counts were not grouped, Napoli's fraud counts yield an offense level of 20 (*i.e.*, for frauds involving more than two victims and more than $1,500,000 but not more than $2,500,000), *see* § 2F1.1, and his money laundering count would yield an offense level of 25 (*i.e.*, for a money laundering with a base offense level 20 and of more than $1,000,-000 but no more than $2,000,000), *see* § 2S1.1. Under § 3D1.4, the total combined offense level for these two counts would thus be 26 [11] as well.[12]

Because the guidelines for fraud and money laundering measure different types of harms and measure them in different ways, and because grouping these crimes would permit unintended results in many circumstances, we find that Napoli's fraud and money laundering counts are not of the "same general type" and should not be grouped together under subsection (d). *See, e.g., United States v. Taylor*, 984 F.2d 298, 303 (9th Cir.1993) (holding that "grouping under section 3D1.2(d) is not appropriate when the guidelines measure harm differently"). We therefore join sev-eral of our sister circuits and hold that the district court was correct not to group Napoli's fraud and money laundering counts under subsection (d). *See, e.g., O'Kane*, 155 F.3d at 974 (refusing to group money laundering and fraud counts under subsection (d) because, "on the facts before [the court], the offense level for money laundering [was] not 'determined largely on the basis of the total amount of harm or loss'; rather it [was] determined largely by the eleven level higher starting *base* offense level"); *United States v. Kneeland*, 148 F.3d 6, 15–16 (1st Cir.1998) ("Without making any determination as to whether there are situations in which the offense level for money laundering might be largely determined on the basis of total amount of harm or loss, we are persuaded that, in this case at least, the offense level for money laundering was not based on aggregate harm and thus does not fall within the purview of subsection (d)" (footnote omitted)).

### B. Organizer/Leader

■ U.S.S.G. § 3B1.1 instructs courts to increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was *otherwise extensive*, increase by 4 levels.

(Emphasis added.)[13] Application Note 3 to § 3B1.1(a) directs that "[i]n assessing

---

tion of separate harms that were perpetrated against separate victims, at separate times, and that would not otherwise be accounted for once the counts were grouped.

**10.** This offense level is based on money laundering because the money laundering guideline yields a higher offense level than fraud. *See, e.g.,* § 3D1.3(b) ("When the counts involve offenses of the same general type to which different guidelines apply (*e.g.*, theft and fraud), apply the offense guideline that provides the highest offense level.").

**11.** The district court also enhanced both counts by 4 levels under § 3B1.1(a) for Napoli's leadership role in the offenses, and 2 levels under § 3C1.1 for obstruction of justice, thus resulting in a total offense level of 26 for the fraud and 31 for the money laun-dering. Under § 3D1.4, his total offense level was thus 32. This number is, however, the same number that would result from the grouping of the two counts, after 4 levels are added (under § 3B1.1(a)) and 2 (under § 3C1.1) to the 26 discussed in the text.

**12.** This result should not be altogether surprising given that there is no overlap in the harms measured by each count and that the grouping rules, whether under § 3D1.2 or § 3D1.4, always "seek to provide incremental punishment for significant additional criminal conduct." Introductory Commentary to Ch. 3 Part D.

**13.** Section 3B1.1 provides, however, that "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity

whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." For example, "a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *Id.*

Although Napoli was the leader of a scheme involving only four knowing participants—*i.e.*, Pincus, San Fillippo, Wigger and Napoli himself—the district court made a factual finding that Napoli's criminal activity was "otherwise extensive" because it involved numerous unknowing participants, including employees of the Trump Plaza casino, OTB, various banks and Wigger's girlfriend, Mary Ann Brown.[14] Napoli claims the district court's finding was clearly erroneous because the court did not properly apply the three-part test promulgated in *United States v. Carrozzella*, 105 F.3d 796 (2d Cir.1997).

> In *Carrozzella*, we held that
>
> [i]n determining whether a criminal activity is "otherwise extensive" as the functional equivalent of one involving five or more knowing participants, we believe that the following must be determined by the sentencing court:
>
> (i) the number of knowing participants;
>
> (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent;
>
> (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme.

*Id.* at 803–4. We explained in *Carrozzella* that the "otherwise extensive" language of § 3B1.1(a) relates not to factors like the "amount of loss, extent of planning, [or] the number of victims," which are typically considered in other enhancements to a defendant's offense level, but rather to "the size of the organization in terms of persons

involved that a defendant 'organize[d]' or 'le[d].'" *Id.* at 802–03 (citing to the offense level calculations of fraud under § 2F1.1). To be counted, unknowing participants must, however, do more than facilitate the defendant's conduct; they must perform conduct that is "peculiar and necessary" to the criminal scheme. *Id.* at 803–04 (noting that a taxi driver who happens to drive a leader of a fraud scheme to the scene of the fraudulent transaction would not be counted in determining whether the criminal activity was "otherwise extensive").

In this case, the district court determined that Napoli's criminal activities were "otherwise extensive" under 3B1.1(a) only after making explicit factual findings relating to the first two prongs in *Carrozzella*. *See Unites States v. Napoli*, CR 95–993 at 7–13 (E.D.N.Y. Feb. 25, 1998) (specifically identifying knowing and unknowing participants). The court did not explicitly address *Carrozzella*'s third prong, which concerns the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme. Napoli argues that by failing directly to address this third prong, and by relying on a summary of the amount of loss involved, the number of victims and the extent of the planning in Napoli's criminal activities, the court committed clear error in concluding that Napoli's criminal activities were "otherwise extensive." We disagree.

We recently held that district courts should be given "latitude" concerning their supervisory role findings, even when their "findings were not as precise as they might have been." *United States v. Persico*, 164 F.3d 796, 804 (2d Cir.1999); *see also United States v. Spencer*, 129 F.3d 246, 253 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1388, 140 L.Ed.2d 648 (1998) (holding that because sentencing

other than described in (a) ..., increase by [only] 2 levels."

14. Brown had, at Napoli's direction, deleted Napoli's name and fax number from a telefax sent to Pincus by Napoli before Pincus became knowingly involved in Napoli's scheme.

judge properly limited her inquiry to persons involved in scheme, "[n]o useful purpose would be served in remanding the case and requiring [the judge] to simply recast her findings in the more explicit terms described by our . . . decision in *Carrozzella*"). Moreover, a "sentencing court's findings as to the defendant's role in the offense will be overturned only if they are clearly erroneous." *United States v. Farah*, 991 F.2d 1065, 1068 (2d Cir.1993). Although the district court here did not explicitly articulate "the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme," the court described how Napoli used the casinos and its personnel to cash and launder the checks from Pincus's accounts. None of these findings is clearly erroneous, and together, they support the conclusion that Napoli was an organizer and leader of an "otherwise extensive" criminal conduct and therefore the four-level enhancement to his offense level. *See United States v. Chacko*, 169 F.3d 140 (2d Cir.1999) ("[T]he district court need only state the general identity of the unknowing participants (or category thereof, in instances where numerous institutional employees were indiscriminately drawn into the scheme) and the basic tasks which these participants unwittingly conducted for the organization.").

III. The Criminal History Category Calculations

A. The Rule 20 Consolidation

U.S.S.G. § 4A1.1 requires the addition of three points to a defendant's criminal history calculations "for each prior sentence of imprisonment exceeding one year and one month." Under § 4A1.2, however, sentences imposed in "related" cases are each assessed only one criminal history point. Application Note 3 to the § 4A1.2(a) directs that cases should be deemed related if they "[1] occurred on the same occasion, [2] were part of a single common scheme or plan, or [3] were consolidated for trial or sentencing."

■ Napoli contends that the district court erred by assigning three criminal points to each of two of his prior convictions that had been consolidated for sentencing after one of the cases had been transferred to the district court under Rule 20 for purposes of plea and sentence. The first conviction, which involved an indictment for bank fraud, originated in New Jersey and was subsequently transferred to a Connecticut district court under Rule 20.[15] The second conviction, which involved an indictment for wire fraud, originated in the Connecticut district court. Napoli pled guilty to the two indictments before the same Connecticut judge and was subsequently sentenced on the same day, October 29, 1991, to two consecutive 3–year sentences. The district court here nevertheless determined that these sentences were "unrelated" for purposes of § 4A1.2 because the frauds alleged in the two indictments were factually unrelated. Napoli does not challenge the factual unrelatedness of the convictions but maintains that the clear terms of § 4A1.2 require that sentences for these convictions must be treated as related because they were "consolidated for . . . sentencing." § 4A1.1.

Despite the initial appeal of this argument, Napoli's position is inconsistent with long established precedent in this

---

15. Rule 20 provides in pertinent part:
(a) Indictment or Information Pending. A defendant arrested, held, or present in a district other than that in which an indictment or information is pending against that defendant may state in writing a wish to plead guilty or nolo contendere, to waive trial in the district in which the indictment or information is pending, and to consent to disposition of the case in the district in which that defendant was arrested, held, or present, subject to the approval of the United States attorney for each district.

circuit.[16] We have repeatedly held that prior sentences imposed on the same day are not "related" as the term is understood under § 4A1.2(a) unless a formal order or statement on the record is made consolidating the sentences and the two cases are "factually related." *See United States v. Mapp*, 170 F.3d 328, 338 (2d Cir.1999) ("Our precedents clearly establish that we do not consider cases to have been consolidated (functionally or otherwise) for sentencing simply because a defendant received concurrent sentences that were imposed on the same day."); *United States v. Gelzer*, 50 F.3d 1133, 1143 (2d Cir.1995) (holding that because two prior sentences were "factually distinct," they were not related under § 4A1.2); *United States v. Rappaport*, 999 F.2d 57, 60 (2d Cir.1993) (holding that although defendant's two prior state court convictions were disposed of simultaneously pursuant to Fla. R.Crim. P. Rule 3.170(b), a "close factual relationship between the underlying convictions" was still required under § 4A1.2); *see also United States v. Patasnik*, 89 F.3d 63, 74 (2d Cir.1996) (holding that even though concurrent sentences were imposed on the same date, they were unrelated because the underlying offenses occurred on different dates, the victims were different, and there was no formal order made on the record consolidating the convictions);

*United States v. Keller*, 58 F.3d 884, 895 (2d Cir.1995) ("Simply because the same court imposes concurrent sentences at the same time does not establish that two or more otherwise unrelated cases were 'consolidated for sentencing,' and therefore 'related.'"). Sentences imposed on the same day only because of "administrative convenience" are, accordingly, not "related" unless a close factual relationship exists between them and they have been consolidated pursuant to a formal order. *See United States v. Lopez*, 961 F.2d 384, 387 (2d Cir.1992).

A Rule 20 transfer order is, moreover, virtually indistinguishable from a transfer order issued under Fla. R.Crim. P. Rule 3.170(b), which we have held not to constitute a "formal order" consolidating two sentences. *See Rappaport*, 999 F.2d at 57. In *Rappaport*, the defendant had been sentenced on the same day before the same judge for two state court convictions. One of the cases had been transferred to the judge under Rule 3.170(b), which permits a defendant to plead guilty to all charges pending in the state in one court. We held that the nothing in the language of Rule 3.170(b) required the consolidation of the sentences and that therefore, the Rule 3.170(b) transfer order was not a "formal order" consolidating the sentences. As with Rule 3.170(b), Rule 20 permits a defendant to transfer a pending case to a

**16.** We note that other circuits have accepted Napoli's argument. *See United States v. Allen*, 153 F.3d 1037, 1045–46 (9th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1094, 143 L.Ed.2d 94 (1999) (a consolidation of sentences after a Rule 20 transfer should have been related under § 4A1.2); *United States v. Woods*, 976 F.2d 1096, 1100 (7th Cir.1992) (not requiring factual relatedness, because, although inclined to disagree with the Guidelines's broad definition of relatedness, it has been adopted in the U.S.S.G.); *United States v. Dorsey*, 888 F.2d 79, 80–81 (11th Cir.1989) (upward departure upheld after district court held sentences imposed after a Rule 20 transfer to be related). See also *United States v. Butler*, 970 F.2d 1017, 1029 (2d Cir.1992) (Newman, J., concurring) ("By including as 'related' sentences those that are consolidated for sentencing, the Commission has shown

that it is not requiring any precise relationship between the prior sentences to preclude them from being counted for career offender sentencing.... [T]he broad sweep of the 'consolidation for sentencing' category indicates that the Commission is taking a fairly generous view of what constitutes 'related' sentences for purposes of career offender sentencing...."). We are bound, however, as a panel of this court to follow the clear precedent of our circuit. *See CFTC v. Dunn*, 58 F.3d 50, 53–54 (2d Cir.1995) (this panel is bound by precedent because a later panel may not disregard the reasoning of a decision because an entirely different line of reasoning was available; conflict is for Supreme Court to resolve), *rev'd on other grounds*, 519 U.S. 465, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997); *United States v. Diaz*, 834 F.2d 287, 289 (2d Cir.1987) (same).

district court in which he has been arrested. As with Rule 3.170(b), the consolidation of sentences before one district court judge is also not a direct function of the Rule 20 transfer order but is done instead purely for administrative purposes. Consequently, the mere fact that the PSR reports that Napoli's prior convictions were sentenced on the same day under Rule 20 is proof neither that the prior sentences were consolidated by formal order of the court nor that the underlying convictions were factually related. The district court committed no error in treating Napoli's two prior convictions as unrelated under § 4A1.2.

Napoli also contends that on March 23, 1994, his sentence of three years imprisonment for his Connecticut conviction was vacated and replaced with a probationary sentence. Under § 4A1.1(a), any sentence for which a defendant has served more than a year and a month of incarceration is assessed three criminal history points. Under 4A1.1(c), however, probationary sentences are assessed only one criminal history point. Because it is possible that Napoli may have served only his New Jersey sentence by the time his Connecticut sentence was vacated, we agree with the government that a remand is necessary for the district court to determine whether Napoli served more than a year and a month for his Connecticut conviction. If Napoli did not, then the district court must resentence him and correct the assessment of criminal history points for that conviction.

### B. The Other Challenged Criminal History Calculations

#### (i) Paragraph 91 of the PSR

■ Napoli further argues that the district court erred by assigning him three criminal history points for a conviction for which a ten-year sentence of imprisonment had been imposed on January 20, 1984, because that sentence was subsequently vacated and reduced to probation on October 20, 1986. Napoli maintains that the

district court should have deemed the January 20, 1984 sentence a probationary sentence imposed more than ten years before the commencement of the instant offense, and that he should have therefore received no points because under § 4A1.2(e)(2), prior probationary sentences are only assessed one criminal history point if the offense was committed within ten years of "the commencement of the defendant's instant offense."

Napoli's position is, however, directly contrary to the explicit terms of § 4A1.2(e)(1), which states that:

> Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. *Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.*

(Emphasis added.)

Napoli was incarcerated for over two and one half years on his original sentence before the sentence was reduced to probation. He therefore served a term of imprisonment of over one year and one month within the fifteen-year period covered by § 4A1.2(e)(1), and the district court properly assigned three criminal history points to the conviction.

#### (ii) Paragraphs 92 and 93 of the PSR

■ Napoli also challenges the district court's assignment of one criminal history point to each of two sentences of five years' probation imposed on him, respectively, on April 1, 1985, for conspiracy to commit fraud, and on May 29, 1985, for conspiracy to distribute cocaine. Napoli pled guilty to the cocaine conspiracy on September 28, 1982, and to the conspiracy to commit fraud on March 10, 1984. Napoli's sentencings for the two convictions were delayed, however, while he was cooperating with the government. Napoli

maintains the delay in both cases was unnecessary and that it is fundamentally unfair for the government's actions to have brought his probationary sentences into the ten-year period for assignment of criminal history points under 4A1.2(e)(2). Under the plain terms of § 4A1.2(e)(2), however, any sentence of probation imposed "within ten years of the defendant's commencement of the instant offense is counted" in a defendant's criminal history calculations.[17]

We agree with the government that Napoli's argument is an attempt "to have it both ways." Napoli's sentences were delayed to give him the potential benefits of cooperation. There is nothing "fundamentally unfair" in assessing Napoli criminal history points for sentences imposed within ten years of the instant offense when Napoli faced the possibility, if sentenced earlier, of having received extensive prison terms for the very serious crimes to which he had pled guilty and the consequent assessment of three criminal history points under § 4A1.1(a) for those convictions.

IV. Downward Departure Motion

 U.S.S.G. § 5H1.4 authorizes courts to depart downwardly if a defendants suffers from an "extraordinary physical impairment." A heart condition by itself is not necessarily a reason to depart downwardly under the Guidelines. See United States v. Altman, No. 96–1298, 1996 WL 739239, 107 F.3d 4 (2d Cir.1996) (affirming district court's refusal to downwardly depart based on sixty-four year-old defendant's serious heart problems and degenerative hip condition). Napoli maintains that he was nevertheless entitled to a departure because poor prison food and his administrative confinement as a former cooperating witness would negatively impact his condition. Napoli argues that the district court focused primarily on the ability of the Bureau of Prisons to treat his

heart condition medically without adequately considering his status as an informant and the effect that segregation would have on his health. Napoli's argument is without merit.

 It is well established in this circuit that a court's decision not to depart from the Guidelines is normally unappealable. See United States v. Brown, 98 F.3d 690, 692 (2d Cir.1996) (per curiam). Such decisions are "appealable only where the [G]uidelines were misapplied, the court misapprehended its authority or imposed an illegal sentence." Id. (internal quotation marks omitted). There is nothing in the record to indicate that the district court erroneously believed it lacked the authority to depart if it so chose. Instead, the district court refused to depart downwardly only after satisfying itself that Napoli was receiving adequate treatment from the Bureau of Prisons, and only after the Chief of the FBI's Witness Security Program reported that Napoli would not be kept in segregation. In short, Napoli has asserted no proper ground to appeal the district court's refusal to depart downwardly on account of his physical condition.

 Napoli also argues that he is entitled to a departure downwardly under §§ 5K1.1 and 5K2.0 because he rendered "substantial assistance" to state law enforcement officials. We need not review the district court's conclusion that it lacked authority to depart without a motion from the government, see e.g., United States v. Kaye, 140 F.3d 86, 88–89 (2d Cir.1998) (remanding for resentencing so district court could consider whether or not it wanted to downwardly depart under § 5K2.0 for defendant's cooperation with local law enforcement), because here the district court expressly stated that even if it had authority, it would not exercise it as a matter of discretion. In coming to this

17. Napoli does not dispute that the instant scheme to defraud commenced on or about

January 1995.

decision, the court explained that Napoli's alleged cooperation with law enforcement authorities was really nothing more than "a means for facilitating his criminal activities." There is ample evidence in the record to sustain the district court's conclusion, and Napoli may not appeal the district court's exercise of its discretion. *See Brown,* 98 F.3d at 692.

## CONCLUSION

For the reasons discussed, we remand for the district court to determine whether Napoli served a year and a month for his Connecticut prison sentence before it was vacated and reduced to probation. If Napoli did not serve at least that amount of time on this conviction, the district court should resentence Napoli and correct its assessment of his criminal history points to reflect that fact. We affirm Napoli's sentence in all other respects.